SILICON IMAGE, INC. Plaintiff,

v.

GENESIS MICROCHIP, INC., and Genesis Microchip Corporation Defendants.

No. CIV. 3:01CV266.

United States District Court,
E.D. Virginia,
Richmond Division.

July 15, 2003.

---

Terrence P. McMahon, David L. Larson,
Paul Devinsky, Behrooz Shariati, Lucy H.

Koh, James J. Li, Michael North, Michael Weber, McDermott, Will & Emery, Washington, DC, Dana J. Finberg, David J. Sensenig, LeClair Ryan, Richmond, VA, for Plaintiff.

Ruffin B. Cordell, Alexander J. Hadjis, Richard G. Green, Evelyn G. Heilbrunn, Thomas M. Melsheimer, Fish & Richardson PC, Washington, DC, Hugh M. Fain, III, Spotts Fain Chappell & Anderson PC, Richmond, VA, for Defendants.

## MEMORANDUM OPINION [REDACTED]

PAYNE, District Judge.

This patent infringement action is before the Court on cross-motions to enforce a settlement agreement embodied in a Memorandum of Understanding ("MOU") that was negotiated on December 17 and 18, 2002, and that was executed on December 18, 2002 by the highest ranking officers of the parties, with authority to bind their respective companies. The parties agree that the MOU is a binding agreement that contains all material settlement terms and that, at least on December 18, 2002, they intended to be bound by that agreement. Thus, there is no dispute that the parties intended to settle the pending patent litigation. Unfortunately, the parties disagree over the terms on which they reached that putative settlement. Each party offers a different interpretation of the MOU, which it urges the Court to adopt and enforce.

## BACKGROUND

The Plaintiff, Silicon Image, Inc. ("Silicon," "SIMG," or "SiI"), is a member of the Digital Display Working Group ("DDWG"), which released the Digital Visual Interface, Revision 1.0 Specification ("DVI Specification") in 1999. Generally,

the DVI Specification describes technology related to an all digital interface between a computer and a digital display.

The DDWG is comprised of a number of "Promoters"—companies that formulated the DVI Specification. Like other Promoters, Silicon owns a number of the patents required to create products that implement the DVI Specification, including, U.S. Patent Nos. 5,905,769 (the " '769 patent") and 5,974,464 (the " '464 patent"), the two patents at issue in this action. To promote DVI technology as an industry standard, and to allow manufacturers to produce components that comply with the standard, the DVI Specification Promoters agreed to give anyone that signed a DVI Adopters Agreement a royalty-free license to practice "Necessary Claims." Generally speaking, Necessary Claims are any Promoter-owned patent claims that one must infringe to implement and comply with the DVI Specification. The DVI Adopters Agreement refers to all other Promoter-owned patent claims as "Non–Necessary Claims," which, although potentially useful in implementing DVI, are not necessarily infringed when complying with the DVI specification. The Adopters Agreement provides no license for the Non–Necessary Claims.

In 1999, the Defendant, Genesis Microchip, Inc. ("Genesis" or "GNSS"), signed a DVI Adopters Agreement and began developing DVI receiver technology, which Genesis later incorporated in a number of its products. In April 2001, Silicon filed this action against Genesis alleging that Genesis infringed: (1) the Non–Necessary Claims of the patents-in-suit; and, (2) the Necessary Claims of the patents-in-suit by selling DVI components for use in the consumer electronics market ("DVI–CE"),[1]

---

1. "DVI–CE" is used herein as a shorthand for DVI components in a consumer electronics field of use. No relationship with the industry's previously proposed enhancements to the DVI 1.0 Specification is intended.

a field of use that the DVI Adopters Agreement license allegedly does not cover because, in Silicon's view, that license is limited to the field of personal computers and associated digital display devices.

In response, Genesis alleged that: (1) its DVI products did not infringe the asserted patent claims; (2) the asserted claims were Necessary Claims and therefore licensed; and, (3) its sales of DVI–CE products were within the scope of the DVI Adopters Agreement license. Thus, the crux of the dispute was Genesis's alleged use of Non–Necessary Claims for DVI components in the personal computer market and both Necessary and Non–Necessary Claims for DVI–CE components.

The Court stayed this action while a like proceeding between the parties progressed before the United States International Trade Commission ("ITC"). The stay was dissolved when Silicon voluntarily terminated the ITC proceeding before a hearing on the merits. Thereafter, the Court entered scheduling orders that set discovery and other deadlines, scheduled a final pretrial conference for January 7, 2003, and set trial to begin on January 17, 2003. The Court held a *Markman* hearing and issued a claim construction opinion on December 10, 2002. Summary judgment arguments were concluded on December 4, 2002 and, on December 16, 2002, the Court entered an order severing two claims of the '464 patent for a separate trial on April 30, 2003 and setting a discovery cut-off of February 28, 2003 on the severed claims.

On December 17, 2003, the Court advised the parties that a summary judgment opinion would be entered on the following day and suggested that further settlement discussions might be in the best interests of both parties. In a telephone conference on December 18, 2002, the parties represented to the Court that they had reached an agreement to settle the pending case, including the severed '464

claims. The parties memorialized their agreement in the MOU, which the Chairman and Chief Executive Officer ("CEO") of each company signed. (Evid. Hearing. Pl.'s Exh. 6) ("MOU § ___"). The MOU called for the parties to prepare so-called "Definitive Agreements" by December 31, 2002; but the MOU also provided that, if the parties were unable to reach Definitive Agreements by that date, the MOU would be the binding agreement until the parties signed Definitive Agreements. (MOU § 7). Accordingly, there being no Definitive Agreements by December 31, 2002, the MOU became the binding agreement. Nonetheless, in early January 2003, the parties endeavored to negotiate the Definitive Agreements envisioned by the MOU. During that process, it became apparent that the parties were not of like mind respecting the meaning of the royalty provisions in MOU Section 1, entitled "License Agreements."

The discussions and draft agreements in January also involved potential terms for inclusion in the Definitive Agreements that are not mentioned in the MOU. When the parties abandoned their efforts to reach Definitive Agreements and filed the pending motions to enforce the MOU, all potential contractual terms not appearing on the face of the MOU fell to the wayside. Briefing on the pending motions has revealed that the sole disputed issue respects the royalties in the MOU License Agreements.

Both parties agree that, under the DVI Adopters Agreement, Genesis has an existing, royalty-free license to practice Necessary Claims in the personal computer field. The parties also agree that the MOU License Agreements confer a license permitting use of: (1) DVI Non–Necessary Claims; (2) DVI Necessary and Non–Necessary Claims in consumer electronics;

and (3) HDMI[2] Non–Necessary Claims. The parties disagree, however, on the royalties payable for these new licenses.

Silicon contends that the royalty rates[3] described in the MOU apply to all the DVI and HDMI transmitters and receivers that Genesis produces, whether or not those products infringe any patent claims. In Silicon's view, although the MOU license grants are limited to specific patent claims, the method of payment for those licenses is independent from those limitations, that is to say, the royalty base consists of all Genesis DVI and HDMI transmitters and receivers irrespective of infringement. Under this paradigm, when determining whether Genesis owes royalties on a particular Genesis product, it is not necessary to determine whether that product infringes a licensed Silicon patent claim. Genesis, on the other hand, asserts that the royalty base is limited to those DVI and HDMI transmitters and receivers that actually infringe the patent claims described in the MOU license grants.

On January 13, 2003, Silicon filed its Motion Re December Proceedings in which it proffered the foregoing construction of the MOU, alleged that Genesis was attempting to renege on the MOU as thus construed, and requested the Court to find that the MOU bound the parties according to Silicon's construction. On the same day, Genesis filed its Motion To Dismiss, urging its own construction of the MOU and arguing that the terms of the MOU require Silicon to dismiss the pending patent infringement action.[4] On March 7 and 8, 2003, in accordance with the controlling law discussed below, the Court held an evidentiary hearing to resolve disputed factual issues respecting the MOU, its formation, and the conduct of the parties immediately following formation, all to the end of ascertaining whether the MOU was the product of a meeting of the minds on December 18, 2003.

On March 17, 2003, Genesis issued a press release announcing a merger with Pixelworks, Inc., a competing producer of digital display technology. That same day, Silicon moved for expedited discovery respecting the Pixelworks merger, reasserting its position that Genesis was attempting to renege on the MOU and arguing that the merger and associated negotiations might explain why Genesis had changed its position. On March 19, 2003, the Court issued an order granting the proposed limited discovery.

On March 24, 2003, Silicon too announced a corporate transaction, revealing its acquisition of TransWarp Networks ("TransWarp"), a privately held company focused on switching and storage management—product areas that are unrelated to

---

**2.** HDMI, the High Definition Multimedia Interface 1.0 Specification, will have a licensing scheme similar to DVI in which those who sign an HDMI Adopters Agreement will obtain a license to practice HDMI Necessary Claims. It is unclear from the record whether that license will be royalty free; but, if the HDMI Adopters Agreement is parallel to the DVI Adopters Agreement, the license will be royalty free.

**3.** For purposes of discussion, the "royalty rate" is the dollar amount charged, per product, to pay for the license grant and the "royalty base" is the universe of products subject to the royalty rate.

**4.** Although Genesis has offered its own interpretation of the MOU, Genesis maintains that the Court may not interpret the MOU, but should merely enforce the dismissal called for in MOU Section 0. As will be seen, Fourth Circuit precedent requires the Court to enforce a complete settlement, with all material terms, or to find that there was no settlement. Therefore, there is no merit to Genesis's assertion that, because any resolution of the MOU's license terms would be speculative or hypothetical, the Court should not interpret any provision of the MOU.

the technology at issue in this action. On April 3, 2003, Genesis moved for expedited discovery on substantially the same basis that Silicon had sought discovery respecting the Pixelworks merger, but that motion was denied because, *inter alia,* it became evident that the structure and timing of the TransWarp transaction, and the nature of the affected market, were such that the transaction could not have borne on the settlement negotiations here at issue.[5] With some difficulty, all discovery and supplemental briefing respecting the MOU concluded on May 6, 2003.

This procedural context informs the ensuing discussion and application of the substantive law.

## DISCUSSION

The parties' request to enforce a settlement agreement containing disputed terms presents several issues. First, it is necessary to determine the procedure that a district court must follow when asked to enforce a settlement agreement in an action that remains pending. It is next necessary to determine the law applicable to the formation and interpretation of the settlement agreement as well as the parties' respective burdens of proof with respect to those issues. Finally, the Court must determine whether the settlement agreement was the product of mutual assent to the material terms of settlement. To do that, the Court must interpret the settlement agreement. Each of these issues is addressed in turn.

---

**5.** In particular, Silicon and Transwarp had reached a memorandum of understanding respecting the acquisition on September 24, 2002 and reached a final agreement on December 9, 2002, prior to the settlement negotiations that resulted in the MOU here at issue. *See* Transcript of Telephone Conference p. 12 (April 11, 2003). The final acquisi-

## I. Procedure For Resolving Disputes With Respect To A Putative Settlement Agreement

The solemnity with which the federal courts approach settlement agreements cannot be overstated. On that point, it has been said that:

> Agreements settling litigation are solemn undertakings, invoking a duty upon the involved lawyers, as officers of the court, to make every reasonable effort to see that the agreed terms are fully and timely carried out. Public policy strongly favors settlement of disputes without litigation. Settlement is of particular value in patent litigation, the nature of which is often inordinately complex and time consuming. Settlement agreements should therefore be upheld whenever equitable and policy considerations so permit. By such agreements are the burdens of trial spared to the parties, to other litigants waiting their turn before over-burdened courts, and to the citizens whose taxes support the latter. An amicable compromise provides the more speedy and reasonable remedy for the dispute.

*Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368, 1372 (6th Cir.1976); *see also Hemstreet v. Spiegel, Inc.,* 851 F.2d 348, 350 (Fed.Cir.1988) ("The law strongly favors settlement of litigation, and there is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into.").

 District courts have inherent authority, deriving from their equity power, to enforce settlement agreements. *Hens-*

---

tion agreement gave Silicon an option to purchase Transwarp shares by April 7, 2002; an option that Silicon exercised on March 24, 2003. *Id.* at 13. The agreement allowed only Silicon to perform due diligence and Silicon never disclosed the MOU's terms to Transwarp. *Id.* at 13, 16.

*ley v. Alcon Labs., Inc.*, 277 F.3d 535, 540 (4th Cir.2002). A court may enforce a settlement agreement within the context of the underlying litigation without the need for a new complaint. *Id.* When asked to enforce a settlement agreement, a district court should engage in two distinct inquiries. First, the court should ascertain whether the parties have in fact agreed to settle the action. *Moore v. Beaufort County, N.C.*, 936 F.2d 159, 162 (4th Cir. 1991). Once the court determines that the parties have agreed to settle, the court must discern the terms of that settlement. *Id.; see also Power Services, Inc. v. MCI Constructors, Inc.*, No. 00–1358, 3 Fed. Appx. 190 (4th Cir.2001) (unpublished).[6]

█ The court cannot enforce a settlement until it concludes that the parties have reached a complete agreement. As the Fourth Circuit has held:

> the district court only retains the power to enforce complete settlement agreements; it does not have the power to impose, in the role of a final arbiter, a settlement agreement where there was never a meeting of the parties' minds. Where there has been no meeting of the minds sufficient to form a complete settlement agreement, any partial performance of the settlement agreement must be rescinded and the case restored to the docket for trial.

*Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir.1983) (citations omitted). "Thus, to exercise its inherent power to enforce a settlement agreement, a district court (1) must find that the parties reached a complete agreement and (2) must be able to determine its terms and conditions." *Hensley*, 277 F.3d at 540–41.

█ When a factual dispute arises over the agreement's existence or its terms, the district court may not enforce the agreement summarily. *Id.* at 541. Instead, it must conduct a plenary evidentiary hearing and make findings on the issues in dispute. *Id.* A district court cannot enforce a settlement agreement if the evidence reveals that the parties did not reach an agreement or that they did not agree on all the material terms. *Id.* If the Court determines that there was no meeting of the minds, *i.e.*, that there was never complete agreement on the material settlement terms, then the action must be restored to the calendar and come to trial with the parties placed in precisely the same position as they occupied before the putative settlement. *Wood v. Virginia Hauling Co.*, 528 F.2d 423, 425 (4th Cir. 1975).

As explained in Section II.A below, the procedure a district court must follow in deciding a motion to enforce a settlement agreement is a matter of regional circuit law. In keeping with that principle and the decisions of the Fourth Circuit, the Court held an evidentiary hearing and allowed limited discovery to aid in determining the terms of the MOU and whether the parties in fact agreed to those terms. Before addressing the evidence thereby obtained, it is first appropriate to outline the legal principles to be used to "determine the terms and conditions" of the MOU.

## II. Applicable Legal Standards

### A. Sources Of Law

█ A settlement agreement is a contract and disputes respecting a settlement agreement are resolved according to the principles applicable to contracts generally. *Power Services*, 3 Fed.Appx. at 192; *Byrum v. Bear Inv. Co.*, 936 F.2d 173, 175

---

6. Unpublished opinions are not binding as precedent in the Fourth Circuit and, in fact, their citation is discouraged except in unusual circumstances. 4th Cir. Local Rule 36(c). Nonetheless, unpublished decisions are of utility in assisting the analysis of the issues.

(4th Cir.1991); *Armstrong v. Davis,* 275 F.3d 849, 876 (9th Cir.2001); *Howard v. America Online, Inc.,* 208 F.3d 741, 747 (9th Cir.2000); *Core–Vent Corp. v. Implant Innovations, Inc.,* 53 F.3d 1252, 1258 (Fed.Cir.1995). This dispute, however, concerns an agreement to settle an action arising under the federal patent laws. Thus, it is first necessary to determine whether the federal common law or state contract law shall provide the applicable contract interpretation principles.

In *Gamewell Manufacturing, Inc. v. HVAC Supply, Inc.,* 715 F.2d 112, 115 (4th Cir.1983), the Fourth Circuit, directly addressing that issue in a patent infringement action, held that federal common law principles govern the standards by which federal litigation may be settled. The Fourth Circuit explained, "[s]ettlements ... assertedly entered into in respect of federal litigation already in progress *implicate federal procedural interests distinct from the underlying substantive interests of the parties ... [, so that] the standards by which that litigation may be settled,* and hence resolved short of adjudication on the merits, *are preeminently a matter for resolution by federal common law principles,* independently derived." *Id.* (emphasis added). As a result, the Fourth Circuit found it proper to "apply an independently derived federal standard to govern resolution of the settlement issues raised in [that] case." *Id.* at 116. The courts in this circuit have continued to follow the *Gamewell* holding in various types of federal litigation,[7] including settlements in patent cases. *Commonwealth Film Processing, Inc. v. Courtaulds United States, Inc.,* 717 F.Supp. 1157, 1158 (W.D.Va.1989) (applying federal common law to a patent litigation settlement agreement that was, in essence, "a complete, fairly complicated, license agreement").

The Fourth Circuit, rather than the Court of Appeals for the Federal Circuit, decided the appeal in *Gamewell* because the underlying action was filed before October 1, 1982, the effective date of 28 U.S.C. § 1295(a), the statute vesting exclusive jurisdiction over patent appeals in the Federal Circuit. Because the Federal Circuit now receives all such appeals, the Fourth Circuit may never have the opportunity to revisit the *Gamewell* holding in the patent litigation context. This procedural nuance is of some moment because the Federal Circuit has held that, in some instances, settlement agreements in patent cases are governed by state contract law. *Gjerlov v. Schuyler Labs., Inc.,* 131 F.3d 1016, 1020 (Fed.Cir.1997) (applying state contract law, as opposed to "federal patent law," in interpreting a settlement agreement because such was "a question of contract interpretation"); *see also Rhone–Poulenc Agro v. DeKalb Genetics Corp.,* 284 F.3d 1323, 1327 (Fed.Cir.2002) (finding, in the context of a license unrelated to a settlement agreement, that "in general, the Supreme Court and [the Federal Circuit] have turned to state law to determine whether there is contractual 'authority' to practice the invention of a patent. Thus,

---

7. *See Pinchback v. Armistead Homes Corp.,* 907 F.2d 1447, 1453 (4th Cir.1990) (holding that the "effect of the release on Pinchback's federal [discrimination] claims against Armistead is a question of federal law" and interpreting the settlement agreement according to federal law); *In re Complaint of Eastern Shore Diving & Marine Servs.,* 845 F.Supp. 371, 374 (E.D.Va.1994) (applying federal common law to determine the enforceability of a liability

release); *see also Auer v. Kawasaki Motors Corp., USA,* 830 F.2d 535, 538 (4th Cir.1987) (upholding *Gamewell* but also holding that state law determines the effect of settlement agreements implicating third parties whose rights and duties derive from state law), *cert. denied, Ebaugh v. Cessna Aircraft Co.,* 485 U.S. 905, 108 S.Ct. 1076, 99 L.Ed.2d 236 (1988). *But see Byrum,* 936 F.2d at 175; *Power Servs.,* 3 Fed.Appx. at 192.

the interpretation of contracts for rights under patents is generally governed by state law."). *But see Core–Vent Corp.*, 53 F.3d at 1256–59 (looking only to decisions from the United States Court of Claims for applicable principles in resolving a dispute respecting the settlement of a patent infringement action).

▆▆▆ Nevertheless, in reviewing procedural matters that do not "relate" to patent issues, the Federal Circuit adjudicates the rights of the parties in accordance with the applicable regional circuit law. *Wang Laboratories, Inc. v. Applied Computer Sciences, Inc.*, 958 F.2d 355 (Fed.Cir.1992); *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1575 (Fed.Cir.1984). A procedural matter is related to patent issues where it: (1) is itself a substantive patent law issue; (2) pertains to patent law; (3) bears an essential relationship to matters committed, by statute, to the Federal Circuit's exclusive control; or, (4) implicates the Federal Circuit's jurisprudential responsibilities in a field within its exclusive jurisdiction. *Bose Corp. v. Infinity Sys. Corp.*, 274 F.3d 1354 (Fed.Cir. 2001); *Midwest Industries v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed.Cir. 1999). Because the present questions respecting the formation and terms of a settlement agreement, which arise in the context of deciding whether to enforce the agreement, are not peculiar to patent law, Fourth Circuit precedent is controlling and, therefore, federal common law is applicable. State law, however, remains an appropriate source from which to draw contract law principles. As the court noted in *Sadighi v. Daghighfekr*:

> To provide some content to federal common law, a district court "is free to choose any rule it deems appropriate, and it may look for guidance to other federal contexts, to what it perceives to be first principles, to considerations of equity and convenience, or to the law of

the forum state." Charles Alan Wright et al., *Federal Practice & Procedure* § 4514, at 457 (1996). As the Fourth Circuit put it, district courts should "seek the appropriate federal rule in the usual sources—the best-reasoned decisions in the general common law." *Gamewell Mfg., Inc.*, 715 F.2d at 115.

66 F.Supp.2d 752, 759 n. 2 (D.S.C.1999) (applying forum law to the settlement of all claims).

▆▆▆ To the extent that state law does inform the contract construction principles applicable to the MOU, California law is most appropriate. The Virginia choice of law rules provide that contracts are governed by the law of the place where the contract is made. *Johnson v. MPR Assocs.*, 894 F.Supp. 255, 258 n. 1 (E.D.Va. 1994). Unless otherwise provided in the contract or by statute, "a contract is made at the place where the contract is executed; the contract is executed where acceptance occurs; and acceptance occurs where the last act is done which is necessary to make it binding." *Western Branch Holding Co. v. Trans Marketing Houston*, 722 F.Supp. 1339, 1341 (E.D.Va.1989). Here, the MOU was negotiated, written, and executed in California by California residents and the parties were in California when they participated in a conference call to confirm that the MOU had been executed. Therefore, California contract law is the applicable state law source. In any event, whether to observe federal common law and, where helpful, California law, or whether to apply only California law, is not outcome determinative because the parties have identified no conflicts with respect to the legal principles that apply here. Nor has the Court ascertained any difference between federal common law and California law on the controlling principles.

## B. Applicable Principles In Interpreting Settlement Agreements

Two basic points require consideration: (1) briefly, the burden of proof; and (2) more fully, the applicable principles of contract interpretation and formation.

### (1) Burden Of Proof With Respect To Asserted Contract Interpretations

 The parties agree that each bears the burden of proof on its respective interpretation of the disputed MOU provisions. Genesis, however, asserts that Silicon has the burden of overcoming the standard presumption against the drafter of disputed contractual terms. Because the MOU was negotiated and drafted by both parties in a joint drafting session, that presumption is inapplicable here. *See Hendrick v. Brown & Root, Inc.,* 50 F.Supp.2d 527, 533 (E.D.Va.1999) ("ambiguities in unilaterally prepared contracts are ... resolved against the drafter") (emphasis added); *AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253, 1265 (1990) (insurance policy not strictly interpreted against an insurance company where the policyholder did not suffer from lack of legal sophistication or a relative lack of bargaining power, and where it was clear that the insurance policy was actually negotiated and jointly drafted); *Bristol–Myers Squibb Co. v. United States,* 48 Fed. Cl. 350 (2000) ("When the contract terms are negotiated, *contra proferentem* is inapplicable.") (citations and quotations omitted).

### (2) Applicable Contract Interpretation Principles

 As previously set forth, a settlement agreement is a contract. *Hensley,* 277 F.3d at 540; *Core–Vent,* 53 F.3d at 1256; *Timney v. Lin,* 106 Cal.App.4th 1121, 131 Cal.Rptr.2d 387 (2003); *In re Marriage of Hasso,* 229 Cal.App.3d 1174, 1180–81, 280 Cal.Rptr. 919 (1991) ("A settlement agreement is in the nature of a contract and is therefore governed by the same legal principles applicable to contracts generally."). To interpret the contract, *i.e.,* to ascertain the sense and meaning of the language setting forth each party's contractual obligations, the Court must look to their objective manifestations of intent. *Core–Vent,* 53 F.3d at 1256. The clearest manifestation of intent is the contract's plain language. *Providence Square Assoc., L.L.C. v. G.D.F., Inc.,* 211 F.3d 846, 850 (4th Cir.2000); *U.S. Cellular Inv. Co., Inc. v. GTE Mobilnet, Inc.,* 281 F.3d 929, 934 (9th Cir.2002); *Barseback Kraft AB v. United States,* 121 F.3d 1475, 1479 (Fed.Cir.1997) (*citing McAbee Constr. Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996); *C. Sanchez and Son, Inc. v. United States,* 6 F.3d 1539, 1543 (Fed.Cir.1993)); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir. 1991); *People v. R.J. Reynolds Tobacco Co.,* 107 Cal.App.4th 516, 525, 132 Cal. Rptr.2d 151 (2003). Where that language is clear and unambiguous, the proper interpretation is that which assigns the plain and ordinary meaning to the contract terms. *Providence Square,* 211 F.3d at 850. If the language is ambiguous, however, the Court may resort to extrinsic evidence to uncover the intent of the parties and, hence, the proper interpretation of the contract. *Providence Square,* 211 F.3d at 850.

 Although extrinsic evidence respecting contractual terms is thus relegated to those situations in which a court finds the terms ambiguous, only "[w]here contractual language is capable of two *reasonable* interpretations," is it ambiguous. *Safeco,* 26 Cal.4th at 763, 110 Cal.Rptr.2d 844, 28 P.3d 889 (emphasis added); *see also Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 751 (Fed.Cir.1999); *Lange v. TIG Ins. Co.,* 68 Cal.App.4th 1179, 81 Cal. Rptr.2d 39 (1998); *Aetna Cas. and Sur.*

*Co. v. Fireguard Corp.,* 249 Va. 209, 455 S.E.2d 229, 232 (1995). In determining what is reasonable, a court must examine the context and intention of the contracting parties. *Metric Constructors,* 169 F.3d at 752; *Hunt Constr. Group v. United States,* 281 F.3d 1369, 1372 (Fed.Cir.2002) ("The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts."); *Sy First Family Ltd. Partnership v. Cheung,* 70 Cal. App.4th 1334, 1342, 83 Cal.Rptr.2d 340 (1999); *County of Marin v. Assessment Appeals Bd.,* 64 Cal.App.3d 319, 134 Cal. Rptr. 349 (1976); 5 Arthur L. Corbin, Corbin on Contracts § 24.20 (Rev. ed. 2002) ("When the principal purpose of the parties becomes clear, further interpretation should be guided thereby"); 1 Witkin, Summary of Cal. Law Contracts § 695 (9th Ed.1987). Contract terminology cannot be found ambiguous in the abstract. *Avemco Ins. Co. v. Davenport,* 140 F.3d 839, 843 (9th Cir.1998). As the Federal Circuit has explained:

> "[T]he language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person *acquainted with the contemporaneous circumstances."* *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972, 975 (Ct.Cl. 1965). Thus, to interpret disputed contract terms, "the context and intention [of the contracting parties] are more meaningful than the dictionary definition." *Rice v. United States,* 192 Ct.Cl. 903, 428 F.2d 1311, 1314 (Ct.Cl.1970); *see also Western States,* 26 Cl.Ct. at 825; *Corman v. United States,* 26 Cl.Ct. 1011, 1015 (1992).... *Before an interpreting court can conclusively declare a contract ambiguous or unambiguous, it must consult the context in which the parties exchanged promises*.... That context may well reveal that the terms of the contract are not, and never were, clear on their face. On the other hand, that context may well reveal that contract terms are, and have consistently been, unambiguous.

*Metric Constructors,* 169 F.3d at 752 (emphasis added); *see also City of Tacoma v. United States,* 38 Fed.Cl. 582, 589 (1997) (finding that a court may use extrinsic evidence for the limited purpose of explaining the circumstances affecting a contract by shedding light on the parties' objective intent); Restatement (Second) of Contracts § 202(1) (1981) ("Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight."). Here, the "context in which the parties exchanged promises" was in settlement of the pending patent infringement litigation and the Court must adjudge the intent of the parties, and the reasonableness of any contractual interpretation, with that context in mind.

### (3) Mutual Assent/Meeting of the Minds

▬▬▬ Closely related to the concept of intent in contract interpretation is the principle of mutual assent as respects contract formation. Under this principle, "[i]n order for a normal settlement to be effective, it must comply with the normal rules of contract law, and there must be a 'meeting of the minds' as to the terms of the agreement." *Said v. Virginia Commonwealth Univ.,* 130 F.R.D. 60, 63 (E.D.Va.1990); *see also Weddington Productions, Inc. v. Flick,* 60 Cal.App.4th 793, 810–12, 71 Cal.Rptr.2d 265 (1998). A meeting of the minds requires a manifestation of mutual assent. *See* Rest. (Second) of Contracts §§ 17–19, 17 comment c (1981). Assent is not mutual, unless the parties intend to agree upon the same thing in the same sense. *Weddington,* 60 Cal.App.4th at 810–11, 71 Cal.Rptr.2d 265.

Although mutual assent to the contract terms is crucial to the formation of the contract, in evaluating intent, it is the outward expression of intent that controls, rather than a secret, unexpressed intention. *Id.; Wells,* 229 Va. at 78, 326 S.E.2d 672. Therefore, in determining whether the parties mutually assented to the settlement terms, the focus is again on their objectively manifested intentions, *Moore,* 936 F.2d at 162; *Weddington,* 60 Cal.App.4th at 811, 71 Cal.Rptr.2d 265 ("The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestation of consent would lead a reasonable person to believe"). Again, the clearest manifestation of intent is the plain language of the agreement.

The Restatement (Second) of Contracts is also a proper source for common law principles of contract formation. *Gamewell,* 715 F.2d at 115. The Restatement treats the issue of mutual assent thusly:

§ 20 Effect of Misunderstanding

(1) There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and

 (a) neither party knows or has reason to know the meaning attached by the other; or

 (b) each party knows or each party has reason to know the meaning attached by the other.

(2) The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if

 (a) that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party; or

 (b) that party has no reason to know of any different meaning attached by the other, and the other has

reason to know the meaning attached by the first party.

Rest. (Second) of Contracts § 20. "A contract should be held nonexistent under this Section only when the misunderstanding goes to conflicting and irreconcilable meanings of a *material* term that could have either but not both meanings." *Id.* comment d (emphasis added). And, in that respect, each meaning must have a reasonable basis in the contractual language for, " '[h]aving second thoughts about the results of a valid settlement agreement does not justify setting aside an otherwise valid agreement.' " *Hensley,* 277 F.3d at 540 (quoting *Young v. FDIC,* 103 F.3d 1180, 1195 (4th Cir.1997)). A court need not be swayed by, or meticulously probe on its own initiative, a conclusory declaration that a party (at least one who was represented by counsel) believed that the basis for a settlement agreement was something other than that recited in the agreement itself. *Korangy v. Commissioner,* 893 F.2d 69 (4th Cir.1990); *Consolidated Gas Supply Corp. v. F.E.R.C.,* 745 F.2d 281, 283–84 (4th Cir. 1984) ("It is, of course, elementary that an unambiguous document controls, unaffected by contentions of one of the parties that he, she or it meant something else."), *cert. denied,* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985).

Here, the License Agreements and their associated royalties are, of course, material terms in the MOU. Each party acknowledges as much by asserting that, if its own interpretation of these provisions is not controlling, there is no settlement because there was no meeting of the minds. Thus, if each party to the MOU had a different, albeit reasonable, understanding of the royalty provisions at the time they executed the MOU, and neither party knew, or had reason to know, of the other's understanding, there was no mutual assent, no

proper formation, and, therefore, no settlement.

In sum, the clearest manifestation of the party's intent with respect to the MOU is the express terms of the written agreement, interpreted in the context of its purpose—to settle the pending patent infringement litigation. In addition, whether the parties in fact reached a mutual agreement to settle depends, in the first instance, on whether the contract document demonstrates a meeting of the minds on the essential terms of settlement. Where the written agreement is genuinely ambiguous on either point, the Court may resort to extrinsic evidence to resolve the ambiguity.

### III. The Terms Of The MOU

▇▇▇ In accordance with the foregoing principles, the first task is to determine whether the MOU, by its terms, unambiguously evidences the intent of the parties. If so, the MOU is singularly dispositive. In that regard, four aspects of the MOU are relevant: (1) the text and structure of the "License Agreements" in MOU Section 1; (2) the product exclusion provision in MOU Subsection 1.c; (3) the "Cash Payment" provision in MOU Section 2; and, (4) the "Recitals" and "Dismissal" sections. Although each of these aspects is addressed *seriatim*, in the end, intent is to be determined from the MOU as a whole "so as to harmonize and give reasonable meaning to all its parts." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed.Cir.2003); *see also* Cal Civ.Code § 1641 (2003) ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably

practicable, each clause helping to interpret the other."); *Blecher & Collins, P.C. v. Northwest Airlines*, 858 F.Supp. 1442, 1459 (C.D.Cal.1994).

### A. The MOU "License Agreements"

The License Agreements section is separated into three subsections each of which addresses a separate technological area. MOU Subsection 1.a addresses DVI Non–Necessary claims, Subsection 1.b addresses HDMI, and Subsection 1.c addresses DVI Necessary and Non–Necessary claims in the consumer electronics market. Subsection 1.a provides:

> 1. . . . GNSS seeks, and SIMG agrees to provide the following licenses for GNSS to have the right to:
>
> a. Use of SIMG non-necessary claims under the DVI adopters agreement, subject to royalties of $X.XX [8] for integrated receiver IC's [9] and $Y.YY for discrete receiver IC's or any transmitter IC's.

(MOU § 1).

As Silicon interprets this section, "the right to use" certain patent claims is "subject to royalties." Thus, says Silicon, Genesis agreed to pay royalties to obtain "the right to use," without regard for whether it actually uses, the patent claims in making any particular products. Accordingly, says Silicon, the royalty calculation is based on all Genesis integrated receivers IC's ($X.XX per unit) and discrete receiver IC's and transmitter IC's ($Y.YY per unit) sold without regard to whether the units actually infringe any Silicon patent claims. In other words, Genesis is paying for the right to practice patent claims in each

---

8. The Court's original opinion in this matter was filed under seal to protect certain financial information that falls within the confidentiality provision in MOU Section 9 and the Protective Order entered in this action. These financial terms have been redacted from the published version of this Memorandum Opinion. No inference should be drawn from the format of any symbols used to replace financial information in this opinion.

9. An "IC" is an integrated circuit.

product sold, even if Genesis chooses not to exercise that right in making any of those products.

As legal authority for the viability of this interpretation, Silicon cites *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 834, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), for the premise that such licenses have been used for years and are perfectly appropriate. Hazeltine was essentially a patent holding company that did not manufacture any products of its own. Instead, the company licensed its hundreds of patents as a package to manufacturers in the radio and television industries. Hazeltine's licensing packages charged royalties based on a percentage of the licensee's total sales. Essentially, Hazeltine's licensees paid, on the basis of their total sales, for the privilege to use any patents in Hazeltine's patent portfolio, irrespective of whether the licensee actually used one, some, or none of those patents. As Silicon points out, the Supreme Court upheld the "right to use" licenses, accompanied, in that decision, by royalties based on total sales, because such licenses are convenient, *i.e.,* they allow the parties to avoid the time-consuming and expensive process of determining whether the licensee's products practice the patent claims. Although the *Automatic Radio* decision indicates that Silicon's interpretation would result in a lawful contract, it has little bearing on whether the MOU, by its own terms, evidences an intent to create such a license.

Wholly apart from the substantive impact of the "right to" language, Silicon further explains its interpretation by differentiating the license grant clause from the clause setting forth the royalty base. According to Silicon, the license grant clause in MOU Subsection 1.a is: "SIMG agrees to provide the following licenses for GNSS to have the right to … Use of SIMG non-necessary Claims under the DVI adopters agreement." The royalty clause, consisting of the language immediately following the comma, reads: "subject to royalties of $X.XX for integrated receiver IC's and $Y.YY for discrete receiver IC's or any transmitter IC's."

Silicon argues that the former clause describes the right conveyed, while the latter clause describes the compensation for that conveyance. As such, the license grant clause in MOU Subsection 1.a, for example, makes no mention of Necessary Claims because Genesis already had obtained a license to Necessary Claims when it signed a DVI Adopters Agreement, and there was no need to grant such a license in the MOU. The royalty clause, however, does not distinguish between Necessary and Non–Necessary Claims because it is based on product categories. The only limitations in the royalty clause respect product types—"integrated receiver IC's," "discrete receiver IC's" and "any transmitter IC's." Thus, under Silicon's view, the royalty payable for the right to use Non–Necessary Claims is determined by applying the enumerated royalty rates to sales in each of the enumerated product categories, without regard to whether the products practice any patent claims.

Genesis argues that it is impossible to analyze the royalty clause and the license grant clause separately because the license grant enables one to determine which royalties apply to which products. For example, the integrated receiver IC's in Subsection 1.a are subject to $X.XX royalties, while the integrated receiver IC's in Subsections 1.b and 1.c are subject to $Y.YY royalties. Without reading the license grants, says Genesis, it is impossible to determine which royalty schedule to apply. This argument lacks merit because each subsection addresses a separate technological area (DVI, HDMI or DVI–CE) and

one may differentiate the products on that basis.

In further support of its position that the royalty obligations of Subsections 1.a, 1.b and 1.c are linked to actual use of a patent claim listed in the licensing clause, Genesis asserts that the "have the right to" language in the introductory clause of Section 1 has no significance. According to Genesis, all licenses, by nature, confer a right to use and all licensees pay for such a right, but that right does not necessarily inform the scope of the royalty base. Instead, says Genesis, the vast majority of licenses base royalty payments on products that actually infringe the licensed patent claims. Thus, according to Genesis, the "right to" language, without more, is not sufficient to create a license and royalty base of the type described in *Automatic Radio*.[10] That argument is not compelling as respects the textual analysis of the MOU because, even if Genesis is correct that the vast majority of licenses calculate royalties according to actual infringement,[11] that particular piece of evidence is extrinsic to the MOU.

■■■ Genesis also points out that the language in the introductory clause does not grammatically cascade into Subsection 1.b. It is correct that, if the introductory clause in Section 1, "GNSS seeks, and SIMG agrees to provide the following licenses for GNSS to have the right to," is combined with the opening text of Subsection 1.b "GNSS intends to sign an HDMI Adopters Agreement," the result makes no sense. Nevertheless, it is a "cardinal principle of contract construction [ ] that a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Here, it is inescapable that each of Subsections 1.a, 1.b, and 1.c is subject to, and limited by, the introductory clause of Subsection 1, notwithstanding the superficial grammatical discrepancy on which Genesis relies. Moreover, the structure of each subsection makes the reason for the anomaly apparent: the DVI Adopters Agreement referred to in Subsections 1.a and 1.c had been previously executed, while the HDMI Adopters Agreement was yet to be signed ("GNSS intends to sign . . ."). Following the parenthetical statement of future intent "to sign an HDMI adopters agreement," Subsection 1.b mirrors Subsections 1.a and 1.c by describing the substance of the license grant and articulating the royalty terms. To read Subsection 1.b otherwise would be to assert that "use of SIMG non-necessary claims referred to in the HDMI adopters agreement" is not one of the "licenses" that "GNSS seeks and SIMG agrees to provide" as set forth in the introductory clause. Under that view, MOU Section 1.b. would merely set forth the agreed terms of a license, but would not act as an

---

10. Genesis' half-hearted assertions that Silicon's interpretation "borders on patent misuse" merit only a slight nod. (Defs.'s Reply In Supp. of Mot. Dismiss p. 12). As Genesis recognizes, voluntariness of the license agreement is a key consideration and such licenses only constitute patent misuse when the patentee unilaterally insists on them. *Zenith Radio v. Hazeltine Research, Inc.*, 395 U.S. 100, 138, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Engel Indus. v. Lockformer Co.*, 96 F.3d 1398, 1408 (Fed.Cir.1996). As further described herein, Genesis voluntarily agreed to the settlement terms that formed the basis for the MOU and there is no evidence of coercion on the part of Silicon, Genesis' conclusory allegations to the contrary notwithstanding. Indeed, the evidence shows that Genesis was able to obtain concessions from Silicon during the negotiations, such as the royalty credit described in MOU Section 2.

11. Even if this were so, one must also consider that the MOU license was negotiated in the context of settling a particular legal dispute.

affirmative grant. Common sense and well-worn rules of contract interpretation forbid that result.

Genesis also argues that, by virtue of the "right to" text in the introductory clause, "[Genesis] has the option but not the obligation" to use the Non–Necessary Claims. (Defs.'s Reply In Supp. of Mot. Dismiss p. 9). As a result, says Genesis, it has the option of using Silicon's "non-necessary claims and paying a royalty, or using only the necessary claims without paying a royalty." (*Id.*). That would mean that the MOU confers on Genesis an option for free. That argument finds no support in the text of the MOU which contains no mention of an option and does not directly link payment of royalties to the use of a Non–Necessary Claim (which would be the exercise of the option, according to Genesis). And, Genesis does not explain how the text of the MOU supports that result.

With respect to the actual MOU language, Genesis argues that the clause, "subject to royalties" modifies the preceding language so that Genesis pays royalties based on the degree to which it uses the licensed claims. For example, as Genesis interprets MOU Subsection 1.a, only "use of SIMG non-necessary claims" is "subject to royalties." Thus, when there is no "use," there are no royalties.

From the foregoing, it is apparent that neither party contests that each license agreement consists essentially of two clauses: the first granting a license and the second fixing royalties for specified products or a product market. They disagree over how the limitations in the former clause relate to the subject matter in the latter clause. In resolving this disagreement, the starting point for the analysis is the text of each subsection within the MOU's License Agreements.

MOU Subsection 1.a provides a license for the right to use Non–Necessary Claims under the DVI Adopters Agreement that Genesis previously executed; and Subsection 1.b provides a license for the right to use Non–Necessary Claims under the HDMI Adopters Agreement to be executed by Genesis.[12] The royalty clauses of Subsections 1.a and 1.b specify royalties on certain products made, or to be made, by Genesis: integrated receiver IC's, discrete receiver IC's and transmitter IC's.

Except to denote the types of products on which royalties are to be paid, the royalty clauses in Subsections 1.a and 1.b do not further limit the Genesis products on which royalties are due. The royalty clauses certainly do not confine the obligation to pay royalties only on integrated receiver IC's, discrete receiver IC's and any transmitter IC's that infringe a Non–Necessary Claim. Nor do the royalty provisions expressly link the obligation to pay royalties on those products to the use of the licensed claims in making them.

The structure of Subsection 1.c is slightly different. Although it too contains a license grant clause and a royalty clause, the license clause confers the right to use both Necessary and Non–Necessary Claims under the DVI Adopters Agreements in a certain market. And, the royalty clause is keyed to products in that certain market—consumer electronics—and is not limited to specifically defined products sold therein. Like the parallel provisions in Subsections 1.a and 1.b, however, the royalty provision in Subsection 1.c is not explicitly linked to the use of the rights conferred by the license grant. Nor is the royalty provision made applicable

---

**12.** Like the DVI Adopters Agreement, the HDMI Adopters Agreement, when executed by Genesis, will confer a license to use the Necessary Claims thereof.

only to infringing products in the consumer electronics market. The most straightforward reading of each of these provisions thus accords with Silicon's interpretation of the MOU.

Nevertheless, the Genesis interpretation is also plausible because the royalty provision in each subsection is presented as a dependent clause, incapable of standing alone, as a grammatical matter, without also reading the license grant clause. Although there is no explicit link between the enumerated patent claims and the royalty base, and, although there are no express limitations on the royalty base (other than the exclusion for existing licensees in Subsection 1.c), the dependent format could be seen as creating the inference that the author had two objectives: (1) to convey that the royalties described are remuneration for the associated license grant; and, (2) to convey that the royalties described are limited to actual use of the patent claims enumerated in the license grant.

The Court concludes that, without reference to the remainder of the MOU, the text of Subsections 1.a, 1.b and 1.c, given its plain meaning, is consistent with either party's interpretation. What remains, then, is to determine whether both interpretations are consistent with, and reasonable in light of, the remainder of the MOU.

## B. The Subsection 1.c Exclusion

As further support for its interpretation of Section 1, Silicon argues that, where the parties intended to except certain products from the royalty base, they did so explicitly as in MOU Subsection 1.c which provides:

1. ... SIMG agrees to provide the following licenses for GNSS to have the right to:

 c. Expand use of SIMG necessary and non-necessary claims under the DVI Adopters agreement for use in the CE market place, subject to royalties (*excluding existing SIMG licensees for use of DVI in CE*) starting at $Y.YY and adjusting to a floor of $Z.ZZ—adjustment schedule to be determined based upon timing, volume, adoption rate and average selling prices.

(MOU Subsection 1.c) (emphasis added). Silicon points out that, in MOU Subsection 1.c, the parties excluded from the royalty base products that Genesis might sell to certain existing Silicon licensees, but there is no similar express exclusion for products that do not infringe the patent claims enumerated in the various license grant clauses. However, there is no need for such an exclusion if, as Genesis asserts, the royalty base includes only those products that practice the enumerated patent claims. Thus, this argument does not provide support for Silicon's interpretation of the royalty provision because the argument is entirely predicated on the premise that the royalty base includes all products, irrespective of infringement.

## C. The "Cash Payment" Section

The MOU's "Cash Payment" Section provides:

2. *Cash Payment.*

SIMG will accept $A.AA Million payment as cash consideration for the settlement. The payment of $A.AA Million will be paid as follows: $B.BB million on date of execution of Definitive Agreement, and the remaining $C.CC million to be paid in equal quarterly installments over 8 quarters commencing on the first day of each calendar quarter, with the first payment to start on January 1, 2003. Royalties *pursuant to Section 1(a) above shall not apply until such time as more than DD,DDD,DDD integrated receivers have been*

*shipped* subsequent to the date of execution of Definitive Agreement.

(MOU § 2). Silicon points out that this provision does not limit the DD,DDD,DDD integrated receivers shipped to only those integrated receivers that practice Non–Necessary claims. However, as Silicon admits, and as Genesis agrees, the integrated receivers in Section 2 are the same integrated receivers that are subject to royalties under MOU Subsection 1.a. Thus, if Subsection 1.a already limits the royalty base to only those integrated receivers that practice Non–Necessary claims, there would be no need to repeat that limitation in Section 2. Here too, Silicon's argument respecting Section 2 proceeds from the premise that Silicon's interpretation of the License Agreements is correct. Therefore, this argument also fails to provide independent support for Silicon's interpretation of the royalty provision of the License Agreements in the MOU.

### D. The "Recitals" and "Dismissal" Sections

The MOU's "Recitals" and "Dismissal" sections provide:

#### Recitals

Silicon Image has filed actions against Genesis in the U.S. District Court for the Eastern District of Virginia, Case No. 3:01CV266, alleging infringement of U.S. Patent Nos. ['769, '464]; and

The parties wish to terminate the pending litigation and explore a long-term business alliance based on the respective resources of the parties.

NOW THEREFORE, in consideration for the mutual covenants and promises set forth herein, the parties agree as follows:

#### 0. *Dismissal.*

Silicon Image shall dismiss, with prejudice, the above-referenced U.S. District Court action, upon execution of the Definitive Agreements and receipt of the payment of $B.BB million as discussed in Section 2 below.

(MOU p. 1). Thus, the "pending litigation" is a matter intrinsic to the MOU. And, on that point, the text of the MOU reflects an intent to settle the litigation over which products infringe Silicon's patents and to explore a long-term business relationship. Also, Silicon agrees to "dismiss, *with prejudice*," the pending litigation "in consideration for the mutual covenants and promises set forth [in the MOU]." (MOU p. 1) (emphasis added). In other words, the MOU is purposed on settling the pending patent infringement litigation. Because the dismissal shall be "with prejudice," the most reasonable and consistent interpretation of the MOU must be one that addresses and resolves the disputes underlying this action.

It would be unreasonable and absurd to presume that Silicon, or for that matter, Genesis, agreed to settle and dismiss this action with prejudice while simultaneously leaving unresolved each question underlying the core issues in the case. Yet, the MOU interpretation urged by Genesis would yield precisely that result. For example, under the Genesis interpretation, for each Genesis integrated receiver sold, one would have to determine: (1) whether the receiver practices any Silicon patent claims; and, (2) whether those claims are Necessary or Non–Necessary claims under the DVI Adopters Agreement.[13] These are the very questions at the heart of Silicon's Second Amended Complaint and Genesis's Answer. Under Silicon's interpretation, however, royalties are due on

---

**13.** The same would be true respecting whether claims are Necessary or Non–Necessary under the HDMI Adopters Agreement.

specified products (as to Subsections 1.a and 1.b) and on all products in a specified market (as to Subsection 1.c), without regard to infringement and, therefore, neither of those questions need ever be addressed again. Under that interpretation, a dismissal "with prejudice" would be appropriate and desirable for both parties. Under the Genesis interpretation, in contrast, such a dismissal would preclude Silicon from challenging any Genesis assertion that, because the currently accused products do not infringe, they are not subject to royalties under the MOU's License Agreements.[14]

Under the interpretation of the MOU sponsored by Genesis, Silicon settled this action and agreed to dismiss it with prejudice for $A.AA million ($C.CC million of which is payable over two years), the prospect of receiving royalties on infringing DVI integrated receivers after Genesis had first shipped DD.D million infringing DVI integrated receivers, the prospect of royalties on other infringing products, and a public announcement that Genesis had taken the enumerated licenses. Whether Silicon would ever receive royalties, however, would have to be decided in future litigation, for each new Genesis product, notwithstanding that the settled action was to be tried a month after the MOU was executed. That result is at odds with the "Recitals" section of the MOU in which the parties articulate a desire to put the patent infringement action behind them and to embark on a new business relationship. That new putative relationship is further outlined in MOU Section 5 which provides:

> The companies will work together to ensure (1) full compliance with DVI and HDMI standards, (2) full interoperability, and (3) the companies will use reasonable efforts to enforce each [party's]

IP against any third party who is infringing unnecessary claims and/or implementing non-compliant DVI and HDMI products. It is the intention of the parties to promote and influence (to the extent allowed by law through sales and marketing efforts, reference designs, press releases, plug fests, etc.) this interoperability in the market place to encourage customers to use SIMG/GNSS products. The companies will work together to encourage the market to use only "fully compliant" DVI and HDMI implementations.

(MOU § 5).

Silicon's interpretation of Section 1 is further supported by the text of Section 3 of the MOU which provides for a press release. The contents of the press release would reflect that:

a. GNSS and SIMG have settled their disputes and agree to cooperate, support and promote interoperability of DVI and HDMI specifications and their implementations.

b. GNSS has received a license for the right to

 1. Use non-necessary claims referred to in the DVI and HDMI adopter's agreements.

 2. Expand use of necessary claims in DVI license agreement to use in the CE market place.

c. GNSS has agreed to pay SIMG undisclosed settlement, license fee and running royalties.

Here too, the MOU confirms the parties' intent to settle the litigation, to cooperate and, *inter alia*, for Genesis to pay "running royalties" to Silicon. Under the interpretation of the royalty provision urged by Genesis, Silicon would receive no royal-

---

14. After the dispute arose over the MOU's terms, Genesis asserted that it will, as an accord, pay royalties on each of the currently accused products. That assertion has no bearing on the intent of the parties at the time of formation.

ties because, in Genesis' view, none of its products infringe any of Silicon's Patents. (Evid. Hearing Tr. 243, 277, 614–15 (March 7–8, 2003)) ("Tr.___"). And, more importantly, the stated intent to settle the disputes over patent infringement would not be achieved.

Given the text of the MOU, the settlement context in which the parties negotiated the MOU, the goals expressed in the Recitals, and considering Sections 3 and 5 of the MOU, an interpretation of the MOU that would doom the parties to protracted disputes over patent infringement cannot stand. Moreover, that result is at odds with reason and logic. As Genesis asserted during the evidentiary hearing, (Tr. 682), and as previously recognized herein, a contract must receive an interpretation that is reasonable. *Providence Square*, 211 F.3d at 852 ("To the extent we are to rely upon any principle of contract construction, we believe the more applicable principle is that 'the construction [of a contract] adopted should be reasonable, and absurd results are to be avoided.'") (quoting *Transit Cas. Co. v. Hartman's, Inc.*, 218 Va. 703, 239 S.E.2d 894 (1978)); *Gould*, 935 F.2d at 1274 (" 'an interpretation which gives a reasonable meaning to all of [the contract's] parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.' ") (quoting *Arizona v. United States*, 216 Ct. Cl. 221, 575 F.2d 855, 863 (1978)); *Safeco Ins. Co. v. Robert S.*, 26 Cal.4th 758, 110 Cal.Rptr.2d 844, 28 P.3d 889 (2001) ("Contracts are to be interpreted in a manner that makes them reasonable and capable of being carried into effect, and that is consistent with the parties intent.") (citing Cal. Civ.Code § 1643). Silicon's interpretation is eminently reasonable given the structure, text and explicit purpose of the MOU and the context in which it was negotiated.

For the foregoing reasons, the Court accepts Silicon's interpretation as an accurate reflection of the terms to which both parties agreed. The plain language of Section 1 of the MOU viewed in the context of its execution and purpose as demonstrated by the other pertinent text of the MOU, admits of no other reasonable interpretation.

Nevertheless, it is appropriate to examine the extrinsic evidence surrounding the MOU's formation to determine whether there was indeed a meeting of the minds with respect to Silicon's interpretation. In addition, because this action is destined to go further, and lest there be any doubt, it is preferable to reach a conclusion with respect to the disputed facts addressed in the evidentiary hearing and to determine which, if either, interpretation finds support in the extrinsic evidence.

## IV. Findings From The Extrinsic Evidence

The ensuing sections set forth the Court's findings from the evidence presented at the evidentiary hearing and in the exhibits attached to the supplemental briefings. This evidence informs the context in which the parties negotiated the MOU, each party's purpose when forming the MOU, and each party's intent at the time the parties executed the MOU. The Court is also mindful that the acts, conduct and statements of the parties after executing the MOU, but before any controversy arose with respect to the MOU's terms, considered in light of the surrounding circumstances, may have significant probative value in uncovering the parties' original intent. *U.S. Cellular.*, 281 F.3d at 936; *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205 (9th Cir.1998); *Cleary v. News Corp.*, 30 F.3d 1255 (9th Cir.1994); *Saul Subsidiary II Ltd. Pshp. v. Barram*, 189 F.3d 1324 (Fed.Cir.1999); *Alvin Ltd. v. United*

*States Postal Svc.,* 816 F.2d 1562, 1566 (Fed.Cir.1987); *Arizona,* 575 F.2d at 863.

## A. Backdrop Of The Dinner Meeting

Three general background facts help to understand the parties' actions with respect to the settlement negotiations that began on December 17, 2002. Those facts also are pertinent to ascertaining whether there was a meeting of the minds on December 18, 2002 and why the instant dispute has arisen.

First, the parties do not directly compete against one another in either the DVI or HDMI product markets. With respect to the DVI products at issue in this action, Genesis produces integrated receiver products while Silicon produces both transmitters and discrete receivers, but not integrated receivers. (Tr. 196, 245, 249, 253). Genesis produces no HDMI products at this time. Although, Silicon and Genesis had competed in the market for DVI integrated receivers before the outset of this litigation, Silicon no longer produces DVI integrated receivers because, Silicon contends, it lost market share when Genesis infringed Silicon's patents and engaged in unfair competition. (Tr. 46).

Second, throughout the period that the parties were engaged in settlement discussions, Genesis was negotiating a merger with Pixelworks. Genesis and Pixelworks had been involved in sporadic merger discussion since as early as October 2000, but no deal had been consummated. (Pl.'s Supp. Br. In Support of Mot. Re Dec. Proceedings ("Pl.'s Supp.") Exh. 1, p. 4; Exh. 2, p. 36–37). In late October 2002, Genesis board member Alexander Lushtak reinitiated merger discussions with Pixelworks CEO Allen Alley who thereafter met and negotiated with Jim Donegan, Chairman and CEO of Genesis. (Pl.'s Supp. Exh. 3, p. 56:10–57:24) ("Lushtak Depo. ___").

On December 13 and 14, 2002, Donegan met with Alley to discuss preliminary terms of the potential business combination. (Pl.'s Supp. Exh. 1, p. 5) ("Dresdner Materials p.___"). Donegan and Alley also discussed the ongoing litigation between Silicon and Genesis. (Pl.'s Supp. Exh. 8 p. 68) ("Alley Depo. p.___"). Following the meeting, Donegan and Alley agreed to stop discussions so they could each focus on working through their respective so-called "internal issues." (Dresdner Materials p. 5; Pl.'s Reply to Defs.'s Opp. to Pl.'s Supp. Br. ("Pl.'s Supp. Reply") Exh. 35, pp. 112:14–113:15; Exh. 37, pp. 73:11–79:21). One of the "internal issues" that Donegan wished to address was the ongoing litigation between Silicon and Genesis, (Alley Depo. p. 69:14–25), but Alley did not feel that the Silicon issue needed to be resolved before the merger could move forward. (Defs.'s Supp. Br. In Support of Mot. Dismiss ("Defs.'s Supp. Opp.") Exh. 2, Alley Depo. 70). At the close of the December meetings, Donegan and Alley agreed to reconvene the merger talks in January. (Defs.'s Supp. Opp. Exh. 3, Lushtak Depo. 74–75; Exh. 2 Alley Depo. 155–56).

Third, as of December 17, the trial was upon the parties. They were making the requisite pretrial filings. The final pretrial conference was to occur shortly after the commencement of the new year and the trial was to follow shortly thereafter. It was obvious from the *Markman* Opinion and the summary judgment briefing and argument that both sides faced significant risks at trial. And, both sides had a great deal at stake.

Against this backdrop, the following events ensued.

## B. The Discussions During The Dinner Meeting

During a telephone conference on December 17, 2002, only a few days after

Genesis and Pixelworks had last engaged in merger discussions, the Court noted that its decisions on some of the pending motions for summary judgment were imminent and suggested that the CEOs meet and discuss settling this action because judicial decisions, once released, could not be withdrawn or recalled. The Court also expressed the view that a business solution reached by the parties was superior, most often, to decisions reached by judges or juries because the parties had flexibility to achieve results beyond those available at the end of a trial. The parties then arranged for a dinner meeting that very evening at a restaurant in Saratoga, California between Donegan and Dr. David Lee, the Chairman and CEO of Silicon.[15]

Although the merger discussion between Pixelworks and Genesis were on hold until January, Donegan informed Alley in a December 17, 2002 telephone conversation that he was having the dinner meeting with Lee to discuss settling the pending litigation with Silicon. (Pl.'s Supp. Exh. 3, pp. 50:10–51:23) ("Alley Depo p.___"). At some point, Alley had suggested to someone at Genesis that it would be desirable to settle the litigation. (Alley Depo. 62:20–63:24).

After Donegan conversed with Alley, he met with Lee from approximately 8:00 PM until 9:30 PM. As Donegan's testimony reflects, the objective of the dinner meeting was not just to settle the pending lawsuit but to prevent future disputes between the parties on the same issues. (Tr. 267). Because Donegan had become directly involved with Silicon only recently, Lee, at Donegan's request, first briefly summarized the previous dealings between the two companies and how they had arrived at their current adverse situation. (Tr. 47, 193). Lee explained that Genesis

had previously approached Silicon on two occasions soliciting Silicon's interest in either acquiring Genesis or granting Genesis a license to certain DVI technology. (Tr. 47). In both instances, Lee explained that he would explore such transactions when "it makes business sense to both companies," but Lee never heard back from those previous Genesis CEOs. (Tr. 47).

When the discussion turned to settlement, Donegan and Lee opted to forego detailed discussion of their respective legal and technical positions in the lawsuit, deciding instead to focus on a prospective business arrangement that would satisfactorily resolve the dispute between them and form the basis for an ongoing business relationship in which each company could prosper. (Tr. 48, 194). Lee said that, in order for Silicon to settle, it would be necessary to recoup Silicon's $A.AA million legal fees expended in the pending litigation. Lee also told Donegan that it was important for Genesis to recognize Silicon's intellectual property rights by taking licenses to practice DVI Non–Necessary claims in the PC market and both DVI Necessary and Non–Necessary claims in the consumer electronics market. (Tr. 54, 57, 194–95). Of course, those issues were the focal point of the pending patent litigation. Donegan eventually agreed to both propositions, but insisted that only $B.BB million of the $A.AA million be paid up front, with the additional $C.CC million paid over time. (Tr. 203).

Lee agreed to Donegan's proposed payment scheme but also explained that one of his core requirements for settlement was that Genesis recognize Silicon's intellectual property ("IP") rights in the marketplace. (Tr. 57, 195). Interpreting Lee's statements respecting IP recognition as a re-

15. Lee is also the founder of Silicon Image and has been with the company since 1995. (Tr. 41). Donegan has been on the Genesis board of directors since October of 1997, but did not become CEO until January of 2002. (Tr. 188).

quest for ongoing royalty payments, Donegan interjected that any royalties would have to be insignificant. Donegan explained, and Lee understood, that due to Taiwanese competition, Genesis' gross margin on integrated receivers had eroded to approximately SS.S% and, as a result, Genesis was only making TTT–VVV% profit. For this reason, any royalty on integrated receivers had to be insignificant so that Genesis could continue to compete effectively against Taiwanese manufacturers. (Tr. 49–50, 195–96; Pl.'s Br. In Supp. of Mot. Re. Dec. Proceedings Exh. 1 ¶ 4 ("Lee Decl. ¶ ___")).

Lee responded that settlement, and insignificant royalties for integrated receivers, would only be possible if the overall royalty structure would subject Genesis to substantial royalties on any Genesis products that would directly compete with Silicon's products. (Tr. 50–57). In exchange for insignificant royalties on DVI integrated receivers, Lee required significant royalties on the products that Silicon did produce but that Genesis did not, to wit, any DVI transmitters and DVI discrete receivers. (Tr. 50–57). In effect, the goal of this royalty scheme was to signal that Genesis had no intention to compete with Silicon in certain product markets because Lee only wished to grant licenses to Genesis for products that would not directly compete with Silicon products. (Tr. 53; Lee Decl. ¶ 5).

Donegan denies that the two discussed establishing royalty rates based on a distinction between each company's product markets. (Tr. 254). Lee's testimony on this issue is more credible because, although Donegan does not recall any discussion of discrete receivers, (Tr. 254), Donegan acknowledges that Lee said the royalty rate for DVI transmitters would have to exceed the insignificant royalty for integrated receivers. (Tr. 196–97, 252–53, 257). Donegan also recalls that Lee's ba-

sis for that distinction was that any Genesis DVI transmitters would compete with Silicon DVI transmitters. (Tr. 252–53). Finally, Donegan acknowledges that he did not take issue with that approach because Genesis was not, at that time, producing DVI transmitters. (Tr. 196–97, 258). Moreover, Lee's credibility is assessed as generally quite high, while, as explained below, Donegan's credibility is generally assessed as low. For the foregoing reasons, the Court finds that Lee stated, and Donegan understood, that to settle the pending action, Silicon required a royalty scheme that would essentially protect Silicon should Genesis decide to compete directly with Silicon in the DVI product markets.

Donegan did not tell Lee that Genesis intended to pay royalties on only those products that infringed the newly licensed Silicon patent claims. (Tr. 56, 264–65). To the extent Donegan has testified otherwise, that testimony is not credible because it is inconsistent with his other testimony during the evidentiary hearing. *Compare* (Tr. 199) *with* (Tr. 264–65). And, as explained later, Donegan's testimony is lacking in credence generally.

In sum, as a result of the approximately one and half-hour meeting, the CEOs were able to reach a handshake agreement to settle the case on the following essential terms: (1) an initial $B.BB million cash payment payable immediately, with an additional $C.CC million to be paid over time; (2) Genesis would take licenses to practice DVI Non–Necessary claims in the personal computer market and both DVI Necessary and Non–Necessary claims in the consumer electronics market; (3) Genesis would pay insignificant royalties on DVI integrated receivers and more substantial royalties on DVI transmitters and discrete receivers; (4) the pending litigation over whether products made by Gene-

sis infringe Silicon's patents would be ended; and, (5) a joint press release indicating that the parties had settled the pending litigation and that Genesis had taken the aforementioned licenses. There was no agreement with respect to specific royalties, nor was their a detailed discussion of the royalty base, but the CEOs did agree that any royalties for integrated receivers would be insignificant because Silicon no longer produces products in that area, while royalties for transmitters and discrete receivers would be set at a significant level because Silicon continues to produce those products. The parties also agreed to meet again at a later date to draft and finalize a settlement agreement.

## C. The Atler Draft Memorandum of Understanding

Shortly after Donegan and Lee reached an accord at the dinner meeting, Lee relayed his understanding of the accord to Silicon's outside counsel and to Bob Gargus, Silicon's Chief Financial Officer. Later that same night, both Gargus and Lee contacted Daniel Atler, Silicon's Executive Vice President of Business Development. Gargus and Lee related the settlement terms to Atler and asked Atler to prepare a draft memorandum of understanding. (Tr. 152–57).

Atler's first draft was a five-page memorandum of understanding. (Evid. Hearing, Pl.'s Exh. 20) ("Atler Draft p.___"). The Atler Draft required Genesis to pay for the "right to use" the patent claims and required Genesis to make royalty payments "per IC sold or fielded." (Atler Draft pp. 1–3). For example, the Atler Draft states that "[Genesis] will pay [Silicon] $X.XX per IC sold or fielded in the [Consumer Electronics] market." (Atler Draft p. 2). The most straightforward reading of the Atler Draft indicates that the intended royalty base was all Genesis products "sold or fielded," not merely those products that infringe the patent

claims. Atler admits that some portions of the draft do not reflect what Lee told him of the dinner meeting because, rather than limiting himself to the terms Lee described, he was "creative" and took "quite a bit of liberties" in creating the draft. (Tr. 358). Nonetheless, other than the royalty price, this particular clause reflects Atler's understanding of what Lee related to him respecting the royalty base. (Tr. 449–50) ("The concept of paying per IC sold or fielded was what Dr. Lee and I had talked about.").

Gargus and Lee rejected the Atler Draft and never sent it to Genesis because it was too lengthy and because it added details that Donegan and Lee had not discussed or agreed to. (Tr. 355–59). Although the Atler Draft is not an objective manifestation of intent that was ever communicated to Genesis, it is some evidence of what Lee communicated to Atler soon after the dinner meeting, and well-before there was any dispute over the MOU terms. That communication occurred immediately after Lee concluded the dinner meeting with Donegan and tends to corroborate Lee's testimony about what was agreed to at that meeting.

## E. The Lee Email

When Gargus and Lee rejected the Atler Draft, they asked him to prepare a shorter document that summarized the results of the dinner meeting on a "high level." (Tr. 355, 358–59). Atler drafted such a document the same evening and emailed it to Lee, who appended it to an email that he then sent to Donegan at 2:18 AM PST on December 18, 2002. (Evid. Hearing, Pl.'s Exh. 1) (the "Lee Email"). With respect to the license and associated royalties, the appendix to Lee's Email explained, in relevant part:

The basic terms of the understanding made during the dinner meeting held on December 17, 2002 are:

1. GNSS seeks two licenses from SIMG:

 a. Use of non-necessary claims referred to' in the DVI adopters agreement in DVI implementations.

 b. Expand use of necessary claims in DVI license agreement to use in the CE market place.

2. SIMG will accept $A.AA Million payment as a part of the settlement cost plus fair and reasonable royalties for the licenses mentioned above (to be agreed by both parties as we finalize the above license agreements). The payment of $A.AA Million will be made partially over an agreed upon period and royalties will be paid according to the final agreements.

(Lee Email pp. 1–2).

Donegan's assistant received Lee's email the next morning, December 18, 2002 and relayed it to Ms. Ava Hahn, in-house counsel for Genesis, who in turn telephoned Donegan at home and read him the email. (Tr. 205–06). Hahn also informed Donegan that the parties would need to reach an agreement that afternoon, in writing, to preempt the filing of any additional court decisions. (Tr. 206). Donegan believed the email was "dead on" and accurately summarized the agreements reached at dinner the previous evening except for the language indicating that the royalties would be "fair and reasonable." (Tr. 207). Donegan felt that they had actually agreed to "insignificant" royalties in addition to the $A.AA million payment. (Tr. 207;

Evid. Hearing Pl.'s Exh. 14, ¶ 8 ("Donegan Decl. ¶ ___")).

Donegan drove to the office, after stopping off to give notice that he would be unable to attend an off-site meeting that he was slated to head that morning, and called Lee around 7:00 AM PST. (Tr. 62, 207). Donegan said to Lee, "David, I have your email. I hope we're not trying to change this deal. We talked about insignificant royalties. This says 'fair and reasonable.' That's not what we agreed to." (Tr. 207). Lee apologized for the misunderstanding and agreed that certain royalties would indeed be "insignificant," and others would be "fair and reasonable" once they were able to agree on Genesis's core market in more specific terms. (Tr. 64, 207). During this call, Donegan and Lee also agreed to meet that day at Silicon's offices to formulate a written memorandum of understanding in a joint drafting session. (Tr. 64, 207–08).

### E. The Discussions During The December 18 Drafting Session

#### (1) The Stage And The Actors

The following individuals were present at Silicon's offices for the joint drafting session: (1) Donegan; (2) Hahn; (3) Lee; (4) Atler; (5) Terry McMahon, Silicon's outside counsel; and (6) Behrooz Shariati, also Silicon's outside counsel. Ruffin Cordell, outside counsel for Genesis, was not physically present but conversed with the parties periodically by telephone and received draft copies of the MOU by email.[16] The session began shortly before 10:00 AM Pacific Standard Time (PST) on December 18, and continued until approximately 2:30 PM PST. (Tr. 65, 208, 362; Donegan Decl. ¶ 9; Pl.'s Memo. In Supp. of Mot. Re. Dec.

---

**16.** Although outside counsel for both parties participated in the drafting session and a number of the subsequent meetings, none of the outside counsel referenced in this paragraph testified at the evidentiary hearing.

Proceedings Exh. 2 ¶ 4 ("Shariati Decl. ¶ ___")).

The Lee email served as the starting point in drafting the MOU. (*Compare* Lee Email *with* Evid. Hearing, Pl.'s Exh. 2; *see also* Tr. 209–10, 381; Donegan Decl. ¶ 9). Atler controlled the keyboard and input most of the changes to the MOU; but, while doing so, he projected the draft document on a large screen visible to all those present. (Tr. 66–67, 208–09, 363–64, 389, 572–73; Lee Decl. ¶ 15). He also enabled the "Track Changes" feature of the word processing software, which recorded the time and nature of each change to the MOU. (Tr. 381–87; Lee Decl. ¶ 15). This feature also allowed Atler to save iterative versions of the draft MOU, such that each iteration reflected the sum of all changes made since the previous iteration. (*See* Evid. Hearing, Pl.'s Exhs. 2–5; Tr. 375–89). In each such iteration, underlined text represents additions to the previous version, and text stricken through represents deletions from the previous version. (Tr. 375–89). The "Track Changes" feature also provides a "change log," which reflects the time and nature of each document change. (*See* Attachments to Evid. Hearing, Pl.'s Exhs. 2–5; Tr. 375–89, 651–52).[17]

#### (2) The Initial Royalty Discussion

At the outset of the drafting session, Donegan reiterated his disagreement with the "fair and reasonable royalties" language in the Lee email, and Lee agreed that the discussion during the dinner meeting was for insignificant royalties for products that Genesis made and that Silicon did not make. (Tr. 364; Hahn Decl. ¶ 2). This initiated a discussion about

quantifying, in monetary terms, an "insignificant" royalty and also precipitated further discussion of differentiating royalty prices based on each company's core products. (Tr. 364–65). Negotiation progressed quickly on this topic because Genesis was focused on the integrated receiver market while Silicon was focused on the transmitter and discrete receiver markets. (Tr. 366). Donegan proposed a $X.XX royalty for DVI integrated receivers and Lee conditioned his agreement to that price on a $Y.YY royalty for DVI transmitters and discrete receivers. (Tr. 210, 368–71, 435–36). After the parties agreed to those terms, the drafting process began. (Tr. 371).

Donegan admits to discussing the markets on which Genesis and Silicon respectively were focusing, but denies that there was any discussion linking the insignificant royalties on integrated receivers with the significant royalties on transmitters and discrete receivers. (Tr. 261–62). However, Hahn testified that Donegan and Lee had a discussion in which Donegan agreed to a higher royalty on transmitters because Silicon made transmitters and Genesis did not. (Tr. 582). During that discussion, Donegan said that "we don't make [transmitters] and probably never will." (Tr. 582–83). In addition, Donegan acknowledges that the MOU embodies a royalty scheme consistent with the paradigm that Lee had proposed the night before. Specifically, Donegan admits that: (1) the $X.XX royalty on integrated receivers is insignificant; (2) Genesis produces integrated receivers; (3) the $Y.YY royalty on transmitters and discrete receivers is not insignificant; and (4) Genesis does not pro-

---

**17.** Behind each marked-up iterative version of the draft MOU are two attachments. The first attachment is a change log that presents the document changes in the order that the changes appear in the associated version. The second attachment is a change log that presents the document changes in ascending chronological order according to the time the typist made the changes in the associated version. (Tr. 376–77).

duce transmitters or discrete receivers. (Tr. 262–63).

Finally, the chronologically ordered change log associated with the first iterative draft of the MOU supports Atler's testimony that, at the outset of the drafting session, Donegan and Lee agreed to differentiate royalties based on each company's core market. According to the log, the very first change, occurring at 10:08 AM, shortly after the session began, fixed the royalty rates and also associated the royalties with specific product categories. (Evid. Hearing, Pl.'s Exh. 2 Att. 2) (reflecting that the first change added the language ",subject to royalties of $X.XX for integrated receiver IC's and $Y.YY for discrete receiver ICs and any transmitter ICs.").

Moreover, the text of the MOU embodies the paradigm to which Lee and Atler testified. That further undercuts Donegan's testimony that the royalty structure was not keyed to specific products and markets reflective of each party's core business. The Court finds that Lee articulated the intent that the MOU would embody a royalty scheme that differentiated products based solely on product lines (transmitters and integrated and discrete receivers) and product markets (DVI, DVI–CE and HDMI); that Lee's stated purpose was to protect Silicon should Genesis decide to compete directly with Silicon in those lines and markets; that Donegan understood both Lee's intention and his purpose; and that Donegan agreed to craft an MOU embodying those principles.

### (3) Further Licensing Discussions

After the parties had reached an accord respecting the necessary DVI licenses, Atler explained HDMI and the benefits of HDMI to Genesis. (Tr. 247). Atler also printed a copy of the HDMI Adopters Agreement and handed it to either Hahn or Donegan. (Tr. 367–68). Eventually, the parties agreed to make HDMI a part of the MOU and essentially "cut and paste" the DVI license grant in MOU Subsection 1.a to create the HDMI license grant in Subsection 1.b. (Tr. 610). At some point, in reviewing the MOU, the parties realized that the language in MOU Subsection 1.b needed adjustment because Genesis had not yet signed an HDMI Adopters Agreement, so they added, as a parenthetical, "GNSS intends to sign an HDMI Adopters Agreement, and under such agreement GNSS and SIMG agree to the following controlling license terms." (Tr. 532).[18] HDMI has some bearing on Genesis, Pixelworks, and the combined entity that will ensue their merger because HDMI is fully backward compatible with the DVI standard for the personal computer and consumer electronics markets and there does not appear to be an alternative standard to HDMI or DVI in consumer electronics. (Tr. 55; Pl's Supp. Exh. 22; Donegan Depo. 123:24–124:4; Christoffersen Depo. 16:3–17:5).

Several times during the drafting session, Hahn pointed out that the DVI and HDMI Adopters Agreements already provide a license to use Necessary Claims and, as a result, Genesis need only acquire licenses for Non–Necessary Claims in DVI and HDMI and both DVI Necessary and Non–Necessary Claims in the consumer · electronics market. (Hahn Decl. ¶ 4; Tr. 573–74). Both Lee and Atler agreed. (Tr. 574–75, 577). Thus, the parties agreed, and the MOU reflects, that the MOU grants only the following licenses: (1) a license for DVI Non–Necessary Claims; (2) a license for HDMI Non–Necessary

---

**18.** This further supports the Court's previous conclusion that the grammatical inconsistency between the introductory clause in MOU Section 1 and MOU Subsection 1.b is superficial and of no moment in the analysis.

Claims; and (3) a license for both Necessary and Non–Necessary Claims in consumer electronics. (Tr. 555, 574; MOU § 1).

Hahn also testified that she told Atler and Lee that Genesis would pay royalties only on products that practiced Non–Necessary claims. (Tr. 609). That testimony is rejected as inconsistent with the recollection of all others present at the drafting session, including Donegan. (Tr. 72, 265, Lee Decl. ¶ 9; Atler Decl. ¶ 1). It is also inconsistent with the plain text of the MOU. And, it is fundamentally at odds with the objective of bringing to an end the patent infringement disputes involved in this action, as articulated in the MOU and testified to by Lee and Donegan because, as explained previously, that formulation would precipitate endless litigation over whether Non–Necessary Claims were being used. And, it is inconsistent with the acknowledged objective of fostering an ongoing business relationship on which both companies could prosper in the sale of products in their core markets.

As the Silicon and Genesis representatives were reviewing the MOU language, Hahn, who was fairly new to Genesis, was not sure whether Genesis made transmitters and became concerned that the "any transmitter language," which appears in Subsections 1.a and 1.b, was too broad. (Tr. 582). Hahn asked Donegan a number of times whether he was sure that the "any transmitter" language was appropriate and Donegan repeatedly verified that the language was acceptable because Genesis did not make any transmitters and probably never would. (Tr. 108–10, 433, 582–83).

### (4) The Calculation Respecting The $A.AA Million Payment

Although Donegan and Lee had agreed during the dinner meeting to structure the $A.AA million payment as an immediate $B.BB million payment followed by $C.CC million spread over some length of time, they had not discussed a specific period or method for the $C.CC million payment. During the drafting session, Donegan requested that Silicon treat the $C.CC million as a royalty credit, so that, until Genesis shipped the number of integrated receivers that would otherwise generate $C.CC million in royalties, Genesis would not pay any royalties under the MOU. (Tr. 85–86, 89, 214–15, 294–95, 439). This proposed payment scheme significantly reduced the value of the settlement to Silicon, because the original deal, negotiated during the dinner meeting the previous evening, had been for $A.AA million plus royalties to begin immediately upon consummation of the settlement. (Lee Email p. 2). Under the new payment scheme, Silicon would effectively get only $B.BB million plus royalties—a loss of $C.CC million. (Tr. 87, 440–41). Nevertheless, Lee agreed to Donegan's proposal because Donegan said the royalty credit would enable Genesis to remain competitive in the integrated receiver market vis-a-vis the Taiwanese and other competition. (Tr. 87, 436–38). Because Lee understood, based on the agreed royalty scheme, that Genesis would not be competing directly with Silicon in the transmitter or discrete receiver markets, Lee felt it was important for Genesis to be successful in its core market—integrated receivers. (Tr. 87).

To calculate the payment period for the $C.CC million obligation, Donegan determined how long it would take Genesis to sell DD.D million DVI integrated receivers, which, under MOU Subsection 1.a, were subject to royalties of $X.XX per part. (Tr. 214–15). Donegan estimated Genesis's total DVI integrated receiver shipments from the most recent quarter and applied a percentage growth rate to determine that it would take 18 to 24 months for Genesis to ship DD.D million

integrated receivers. (Tr. 214–15, Lee Decl. ¶ 18, Atler Decl. ¶ 13). Based on Donegan's calculation, the parties agreed to the "Cash Payment" in MOU Section 2.

Significantly, Donegan made his calculation using all Genesis DVI integrated receiver shipments, without regard to whether they infringed any particular Silicon patent claims. (Tr. 88–89, 435, 443, Donegan Decl. ¶ 13). In fact, Genesis made clear during the evidentiary hearing that it does not now believe, nor did it ever believe, that any Genesis products, including those products accused in this litigation, infringe any Silicon non-necessary patent claims. (Tr. 277, 614–15). The method Donegan used to calculate the $C.CC million payment period is strong evidence that, at the time the MOU was being negotiated, the parties intended the royalty payments to apply to all of the specified products and product markets, not just to products that infringed.[19]

Donegan now asserts that he based this calculation on *all* Genesis integrated receiver shipments solely as an accord to settle the pending litigation, but there is no evidence that he made any statements to that effect at the time he made the calculation or at any other time prior to the eventual dispute over the MOU's terms. (Tr. 215, 277).

Hahn testified that only infringing products count towards that DD.D million units and that, therefore, no current Genesis product shipments would count under Section 2. (Tr. 617–18). According to Hahn, no current Genesis products are subject to any of the MOU's royalty provisions. Moreover, in Hahn's perspective, and contrary to the "Recitals" section of the MOU, the parties had no hope of resolving any of the issues in the pending litigation during the MOU negotiation, (Tr. 587), and she

"imagined a process would fall into place" to resolve infringement issues at some point in the future. (Tr. 619). Yet, Hahn admits that the parties never discussed any such future methodology for determining infringement (Tr. 619). This testimony highlights a shortcoming in Genesis's interpretation of the MOU. The Court finds that Genesis did not believe that Silicon would agree to dismiss this action with prejudice while leaving the primary issue in the underlying litigation unresolved and unaddressed, without any assurance of future royalties and without any means to effectuate Lee's expressly stated business goals.

### (5) Insertion Of The "Right To" Language

During the drafting session, some of the participants left the room from time to time to confer privately or seek input from others by telephone. (Tr. 575). At one such interval, when the negotiation teams broke up to review a near-final draft of the MOU in separate groups, Donegan and Hahn left the conference room with a printed copy of the MOU while Atler and Shariati remained. (Tr. 417). Atler decided to make his edits to the draft directly on the computer, rather than using a printed copy. (Tr. 417–18). He made several grammatical and typographical changes, including the insertion of the phrase, "have the right to" in the License Agreement so that it read:

*1. License Agreements.*

GNSS seeks, and SIMG agrees to provide the following licenses for GNSS to *have the right to:*

a. Use of SIMG non-necessary claims under the DVI adopters agreement, subject to royalties of $X.XX for

---

19. In Hahn's view, only Genesis integrated receivers that practice Necessary Claims count towards the DD.D million units described in MOU Section 2. (Tr. 618). Her recollection is not credible, differing as it does from that of Donegan who did the calculation.

integrated receiver IC's and $Y.YY for discrete receiver IC's or any transmitter IC's.

b. GNSS intends to sign an HDMI Adopters Agreement, and under such agreement GNSS and SIMG agree to the following controlling license terms: Use of SIMG non-necessary claims referred to in the HDMI adopters agreement, subject to royalties of

(1) starting at $Y.YY and adjusting to a floor of $Z.ZZ—adjustment schedule to be determined based upon timing, volume, adoption rate and average selling prices—for integrated receiver IC's and

(2) $N.NN for discrete receiver IC's or any transmitter IC's.

c. Expand use of SIMG necessary and non-necessary claims under the DVI Adopters agreement for use in the CE market place, subject to royalties (excluding existing SIMG licensees for use of DVI in CE) starting at $X.XX and adjusting to a floor of $Z.ZZ—adjustment schedule to be determined based upon timing, volume, adoption rate and average selling prices.

(MOU § 1 (second emphasis added); Tr. 414–22).[20] This was the text of the final MOU that both Lee and Donegan signed. (MOU § 1).

When Hahn returned to the conference room and found Atler and Shariati making changes to the computer version of the MOU, she was alarmed and she admonished the two not to make changes while the Genesis team was out of the room.

(Tr. 422, 576–77). Atler explained that he was only making non-substantive changes, and pointed out each of his changes to Hahn as well as to Donegan and Lee who re-entered the room soon thereafter. (Tr. 423–28, 578–79). The changes were easily discernible because, like all other changes to the computer version, they were visible on the projection screen in red text that was either underlined or stricken through. (Tr. 412).

When Atler inserted the "to have the right to" language, he believed that the new language merely clarified the License Agreements provision, but did not change what the parties had agreed to in their negotiations. (Tr. 420, 430). According to Atler the change reflected the intent of both parties "that the license was for the *right to use* the patents, whether or not actually used, and that royalty calculations were to be based on any products sold in each defined category, without first having to determine that they practiced particular patent claims." (Alter Decl. ¶ 10). Because Atler believed the "to have the right to" addition was a mere clarification of what the parties had already agreed to, there was no substantive discussion of that new language or any potential effect it might have on the scope of the license or royalty base. (Tr. 426–27, 429, 578). To the extent that Lee testified that Atler engaged in any substantive discussion of the "right to" language with either Hahn or Donegan at the time the language was added, his recollection is rejected as faulty on that point because it is inconsistent with the testimony given by Atler, Hahn and

---

**20.** With respect to the "any transmitter" language in MOU Subsections 1.a and 1.b.2, the Court notes that the Federal Circuit has found, albeit in a dissimilar context, that "[t]he word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive." *Barseback Kraft AB v.* *United States*, 121 F.3d 1475, 1481 (Fed.Cir. 1997) (*quoting Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 115 (3rd Cir.1992)). Here, Silicon's interpretation accords with that analysis, *i.e.*, "any transmitter" means just that—any transmitter Genesis produces, irrespective of infringement.

Donegan, all of whom testified that there was no discussion of that text. (Tr. 90–92).

Genesis is also of the view that the "to have the right to" language has no substantive significance, albeit for a different reason. According to Genesis, that language should have no bearing on the MOU's interpretation because Atler added the language while the Genesis representatives were out of the room. However, Atler added similar language in MOU Subsection 3.b, which describes a press release that the parties will issue to announce the settlement. According to the MOU, that press release will describe the MOU licenses as follows:

b. Genesis has received a license **for the right** to

 1. Use non-necessary claims referred to in the DVI and HDMI adopter's agreements.

 2. Expand use of necessary claims in [sic] DVI license agreement to use in the CE market place.

(MOU Subsection 3.b.) (emphasis added). There is no contention, and no evidence, that any Genesis representatives were out of the room when Atler inserted the "for the right" phrase in Subsection 3.b. (*See* Evid. Hearing Pl.'s Exh. 5 (reflecting that the change occurred over an hour after Atler inserted the "have the right to" language in MOU Section 1)). Nor is there any contention that any Genesis representatives objected to this change.

Genesis contends that this language is redundant because all licenses inherently convey a right to use the licensed property rights and most licenses nevertheless charge royalties based on the licensee's actual use of the rights conveyed. Even if the Court were to accept that assertion, which it does not due to the lack of supporting empirical evidence, the fact remains that the MOU licenses are distinguishable because they were negotiated and agreed to in the context of settling the

pending litigation. Moreover, if the "right to" language were indeed redundant and unnecessary at the time the parties drafted the MOU, there would be no explanation why Atler would twice change the MOU to insert this language or why Genesis would accept the changes without question or protest. On balance, it seems most likely that Silicon is correct that the "right to" language was twice inserted, without further substantive discussion, to clarify that the royalty scheme is based on sales rather than infringement—a royalty scheme that Donegan and Lee agreed to at the dinner meeting and solidified during their initial discussions at the outset of the drafting session.

### (6) Genesis Seeks Board Approval

As negotiations on the MOU concluded, Donegan interjected that the MOU would have to be "subject to board approval" but McMahon did not believe that would be sufficient. (Tr. 215–16). Therefore, Donegan and Hahn went to a private conference room and began seeking board member approval by telephone. (Tr. 105, 216). Donegan was able to reach two board members, Alex Lushtak and Tim Christoffersen, while Hahn was able to reach a third board member, Chandra Reddy. (Tr. 216).

In conversations with Lushtak, Christoffersen, and Reddy, both Donegan and Hahn expressed some urgency and explained that the MOU had to be signed that afternoon. (Tr. 216, 604). Hahn read the entire MOU over the telephone to Reddy. (Tr. 601). Hahn testified that, while reading the MOU to Reddy, she specifically mentioned that Genesis would pay "only for use of Non–Necessary claims," but she has no recollection of discussing, or answering Reddy's questions with respect to, any other MOU provisions. (Tr. 602–08). Hahn's testimony

that she made this statement to Reddy is not credible because it is implausible that, in the entire MOU, the only provision that Hahn felt the need specifically to explain, and the only provision that Hahn recalls discussing, is the one provision that is now at issue. (Tr. 105, 215). Nor did Reddy testify in support of Hahn's version of their telephone conversation.

Eventually, Donegan and Hahn received approval from Lushtak, Christoffersen, and Reddy. (Tr. 105, 216). With Donegan as the fourth board member, the majority of the Genesis board thus approved the MOU and Donegan and Hahn returned to the main conference room. (Tr. 216–17).

**(7) The Drafting Session Concludes**

Eventually the CEOs agreed on the MOU language, signed the MOU, informed the Court that they had reached a settlement, and sent the signed MOU to the Court by facsimile. The CEOs both represented to the Court that they had full authority and board approval to enter into the MOU and to settle the pending litigation.

Although the CEOs had discussed differentiating the royalty rates based on product markets, and although Donegan had made clear that he based his $C.CC million royalty credit calculation on all Genesis integrated receivers sold, irrespective of infringement, at no time during the drafting session did anyone from Silicon explicitly say that the royalty base included all Genesis products without regard to whether the products practiced Silicon's patent claims. (Tr. 431–38, 573; Donegan Decl. ¶¶ 10, 16). At no time during the drafting session did anyone from Genesis explicitly say that the royalty base included only those products that practiced the patent claims described in the MOU license grants. (Tr. 72, 265; Lee Decl. ¶ 19; Atler Decl. ¶ 11). To the extent that Hahn testified otherwise, her testimony is incredible as inconsistent with the memory of all others who testified at the evidentiary hearing and were present at the drafting session, including Donegan. (*Compare* Tr. 609 *with* Tr. 265).

After the meeting, Donegan called Alley to schedule a meeting to continue merger discussions with Pixelworks. (Pl.'s Supp. Exh. 38, pp. 45:17–20). Donegan also told Alley that Genesis and Silicon had reached a settlement and, although the MOU contained a confidentiality clause,[21] Donegan disclosed some of the settlement terms to Alley, including the $B.BB million initial payment and the $X.XX royalty on integrated receivers. (Pl.'s Supp. Exh. 8, pp. 39:24–40:16; Exh. 38, pp. 32:21–33:5). However, Donegan did not tell Alley that the MOU required Genesis to pay royalties on only those integrated receivers that practiced the Non–Necessary Claims.

**F. Reaction To The MOU At Genesis**

During the evidentiary hearing, Donegan was evasive when questioned about the Genesis board's reaction to the MOU. (Tr. 320–21). Donegan implied that the board was supportive of the MOU and only took issue with Silicon's draft definitive agreement. (Tr. 320–21). Contrary to Donegan's testimony, Genesis board member Alexander Lushtak had an immediate, and rather strong, negative reaction to the MOU. (Pl.'s Supp. Exh. 3 132:18–134:2).

Lushtak had orally approved the MOU during a phone conversation with Donegan near the conclusion of the December 18

---

**21.** MOU Section 9 provides:

The terms of this MOU are confidential and are not to be disclosed except on a need-to-know basis to accountants, attorneys and other advisors needed to prepare and execute a Settlement Agreement. The existence of this MOU, and its terms will not be disclosed except as required by law.

drafting session, and he received the MOU by email that same night. Upon reading it, Lushtak felt that Genesis was paying too much. Indeed, Lushtak thought that the royalty rates for transmitters were "absurd" and that those for HDMI were "unreasonable." (Lushtak Depo. 132–33). As a result, Genesis called a telephonic board meeting for the next day, December 19, 2002, to discuss these issues. During the meeting, Lushtak described the MOU provisions that he disliked. (Pl.'s Supp. Exh. 7, Donegan Depo. 89:4–89:24).

Genesis discussed both the MOU and Silicon's draft definitive agreement in subsequent board meetings on December 30, 2002 and January 8, 2003. Notwithstanding, these discussions, which included a discussion of whether to ratify the MOU, the board did not vote to approve the MOU until January 9, 2003, after all attempts at changing the MOU had failed. (Pl.'s Supp. Exh. 3, Lushtak Depo. 136:15–138:16; Pl.'s Supp. Exh. 21).

Also on December 19, 2002, Donegan met with Selim Day, Genesis's outside corporate counsel, and representatives from Dresdner Kleinwort Wasserstein ("DKW"), Genesis's investment bankers, to discuss the Pixelworks merger. (Pl.'s Supp. Exh. 13, Day Depo. 92:17–24; 97:13–98:2) ("Day Depo p.___"). In contrast with Day's later involvement in the efforts to create a definitive agreement embodying the MOU, Day did not participate in the drafting session on December 18, 2002, had not seen the MOU before the meeting with DKW, was not focused on the MOU's terms during the DKW meeting, did not discuss the settlement with anyone from Genesis before December 19, and was not previously aware that Donegan and Lee had met to discuss settlement. (Day Depo. pp. 98, 107–08). During the DKW meeting, Donegan disclosed that the litigation with Silicon was over and he also discussed some of the MOU terms. (Day Depo. pp. 97:15–98:14). After the meeting, Hahn handed Day a copy of the MOU. (Day Depo. pp. 107:9–108:1).

## G. Efforts To Reach A Definitive Agreement

When the December 18 drafting session concluded, Silicon agreed to provide the first draft of a definitive agreement, with a view to reaching a final agreement by December 31, 2002. (Tr. 217). Although Genesis had expected to receive a draft by December 20, Silicon sent its first draft to Genesis on December 24 and sent a revised first draft on December 26. (Tr. 217–18; Lee Decl. ¶ 2). Silicon's first draft required Genesis to pay royalties on each DVI and HDMI receiver and transmitter sold, without qualification.[22]

Donegan was vacationing in the Caribbean when he first received and reviewed Silicon's draft on December 27, 2002. (Tr. 219). Donegan testified that, when he first saw Silicon's draft he noticed "several very, very significant deviations from the MOU" the "most obvious" of which were the draft provisions requiring Genesis to pay royalties on all of the specified products sold whether they infringed or not. (Tr. 220). According to Donegan, when he first viewed the royalty provisions, he thought "it was just an outright drafting error." (Tr. 220). Donegan also noted that Silicon's draft included two provisions that were not in the MOU. Donegan testi-

---

**22.** Silicon's first draft definitive agreement separates the "Licence Grants" and "Royalties" into separate sections. Section 2.1 describes the license for "DVI NON–NECESSARY CLAIMS." Section 2.1.1 "grants to Genesis a non-exclusive license [to produce] DVI Products under the Licensed Patents." Section 4.1 describes the royalty for "DVI Products" and provides that "Genesis shall pay SiI a royalty of ($X.XX) for each integrated receiver sold by Genesis." (Defs.'s Supp. Exh. 6 pp. 6–7). .

fied that, based on these draft provisions, which Donegan considered "substantially" and "fundamentally" different from the MOU, "there was no way" to finalize a definitive agreement by December 31, particularly because "[t]he Genesis people were scattered all over the place at that point in time." (Tr. 221).

A number of inconsistencies in Donegan's testimony undermine his credibility on that issue, and generally. First, as December 31 approached, Lee began to call Donegan to solicit the Genesis response to Silicon's draft definitive agreement. (Tr. 111). Donegan testified that he had extreme difficulty contacting Lee from the island where he was vacationing because an overloaded telecommunications system on the island made contact "difficult most of the time and impossible at other times." (Tr. 222). Yet, Donegan was able to receive the Silicon draft agreement, redistribute the draft from the island to Genesis management and board members, discuss the draft with Genesis counsel, engage in a telephonic board meeting from the island on December 30, and contact both Lee and Gargus on December 31. (Tr. 318–19), Donegan Decl. ¶ 19; Pl.'s Supp. Exh. 15 (Minutes of December 30, 2002 Genesis Board Meeting). Clearly, Donegan had little trouble reaching people from the Caribbean when he so desired.

Second, Donegan testified, "I immediately had [the Silicon draft] sent out, quite frankly with my own comments, as well, Your Honor, as to how the [Silicon draft] differed from the MOU, and I had my own notations." (Tr. 318): When the Court inquired whether Donegan's contemporaneous "comments" and "notations" were in the record or otherwise available, Donegan backtracked, explaining that his "comments" and "notations" were "verbal" and were made by telephone. (Tr. 318–19).

Third, when Donegan finally did contact Lee, on December 31, 2002, he told Lee that it had been impossible for Genesis to provide feedback on the draft agreement or finalize the deal because the Genesis representatives were scattered.[23] (Tr. 120, 224). Yet, subsequent discovery revealed that Donegan had been able to convene a board meeting on December 30, 2002 attended by all seven Genesis board members, Day, Cordell, and James Student from DKW. (Pl.'s Supp. Exh. 15). The minutes from that board meeting reflect that Student gave a presentation respecting "potential strategic business combinations," including the Pixelworks merger, Cordell "updated the Board on the litigation with Silicon Image, including the [MOU]," and the board discussed "previous board action regarding the MOU" and "agreed to discuss ratification of the MOU at its next meeting." (Pl.'s Supp. Exh. 15 (Minutes of December 30, 2002 Genesis Board Meeting); Defs.'s Supp. Opp. Exh. 7, Christoffersen Depo. 125). A primary topic of discussion was Silicon's draft definitive agreement and how it was thought to differ from the MOU. (Defs.'s Supp. Opp. Exh. 7, Christoffersen Depo. 128–30). Thus, contrary to Genesis's assertions and Donegan's statements to Lee, Donegan and others within Genesis had three to four days to review Silicon's draft definitive agreement, and the board had ample opportunity to discuss the matter with counsel.

Finally, although Donegan and Lee spoke a number of times between December 31, 2002 and the morning of January 7, 2003, the first time anyone from Genesis

---

**23.** Donegan made the same statements during the evidentiary hearing and Genesis repeats the assertion in its supplemental brief. (Tr. 120, 220–24); Defs.'s Supp. Opp. p. 27 n. 11 ("SII's delay arguments skip over … the difficulty of rounding up board members, management, and legal counsel to review the new agreements proposed in SII's draft.").

informed anyone from Silicon that Genesis objected to the royalty provision in the Silicon draft definitive agreement was in a group meeting on the afternoon of January 7, 2003. In their first conversation respecting the draft agreement, on December 31, 2002, Donegan told Lee that Genesis felt Silicon's draft agreement differed from the MOU, but, despite Lee's requests, Donegan did not go into any detail in that regard. (Tr. 120–21). In a January 4, 2003 phone conversation, Lee again asked for feedback respecting the Silicon draft agreement and Donegan's only expressed complaint was that the HDMI royalty rate did not decrease from $Y.YY to $Z.ZZ fast enough, but Donegan said he would provide formal feedback and comments on January 6, after a Genesis "internal team meeting." (Tr. 122–23; Donegan Decl. ¶ 20). In a series of telephone conversations on the afternoon of the 6th, Lee repeatedly asked Donegan for feedback. (Tr. 123–26). In response, Donegan again mentioned the alacrity of the decrease in the royalty rate and also said that "Genesis was not happy with Silicon Image's proposal, in particular that it did not reflect the spirit of cooperation that was evident in the MOU," but Donegan did not mention any issues respecting the royalty base. (Tr. 123–26; Donegan Decl. ¶ 21).

On the morning of January 7, 2003, Donegan picked Lee up from the airport and drove Lee to Silicon's offices. (Tr. 126; Donegan Decl. ¶ 22). This was their first face-to-face meeting since Donegan received Silicon's draft definitive agreement. Rather than expressing any dissatisfaction with the royalty provision in the MOU (as reflected in the Silicon draft definitive agreement), Donegan presented Lee with a new one-page "Definitive Agreement Proposal" that differed from the MOU and limited the issues for settlement. (Tr.

125–29; Donegan Decl. ¶ 22; Pl.'s Supp. Exh. 18).

Under the new terms proposed by Donegan, Genesis would receive a license for DVI integrated receivers, including in the consumer electronics market, and Genesis would pay royalties "on sales of such products using non-necessary claims." (Pl.'s Supp. Exh. 18). The newly proposed royalty rate was the "[l]esser of $X.XX or MMM% of average selling price." (*Id.*). The proposal also included a termination provision by which Genesis "would have the right to terminate the agreement (a) for its convenience provided [Genesis] has paid [Silicon] $A.AA million or (b) in the event all applicable patents expire or are found invalid." (*Id.*). Donegan claims that he made the proposal for Lee's benefit because Lee was anxious to announce a settlement and promote HDMI at an upcoming consumer electronics show. (Tr. 226–27). This testimony is somewhat inconsistent with the terms of the proposal, which, unlike the MOU, make no provision for public disclosure of the settlement and "would deal with DVI integrated receiver products only" while "transmitters and HDMI are reserved for a later date." (Pl.'s Supp. Exh. 18). Rather, based on the content of the new proposal, it is clear that Donegan's purpose was to achieve new and different settlement terms that were not part of the MOU to which Genesis previously had agreed.

When Lee quickly rejected the proposal without reading it and expressed a desire to abide by the terms of the MOU, Donegan agreed but suggested a provision that would allow Genesis to terminate the agreement if Genesis were to merge with another company. (Tr. 125–29; Donegan Decl. ¶ 22). Donegan knew all the while, but did not disclose to Lee, that a Genesis–Pixelworks merger was imminent.[24] It is

24. It may be that SEC rules would have discouraged Donegan from disclosing the Pixel-works merger discussions to Lee at this time.

evident from Donegan's behavior that Genesis was searching for ways to avoid its obligations under the MOU.

When Donegan was asked why he did not divulge each of his concerns respecting the Silicon draft in his early conversations with Lee, Donegan testified:

> Well, even though the [Silicon draft] definitive agreement was as different as— it was so different from the MOU, I wanted to believe that it was going to be totally possible to get this done. David [Lee] and I had been successful at dinner. We had been successful in the drafting agreement, and I wish I could give you a feel for how positive the dinner and the drafting agreement was. These were two companies that were working together. I was deathly afraid that by trying to work out substantial differences between the two documents with me 5,000 miles away without people face-to-face, I felt it would be a recipe for disaster. And I also had to get my team assembled and dissect this thing.

This testimony is not credible. For one reason, by December 31, 2002, Donegan had already had the opportunity to assemble a board meeting and get feedback from his board and attorneys respecting the draft agreement. (Pl's Supp. Br. Exh. 15). For another, although Donegan claimed to be "deathly afraid" to discuss any "substantial differences" between the definitive agreement and the MOU over the telephone, he raised his dissatisfaction with the royalty rate reduction provision and derided Silicon's draft agreement as lacking a "spirit of cooperation" in two subsequent telephone conversations with Lee. Although Donegan claims that the provi-

sions respecting the royalty base were the "most obvious" deviations from the definitive agreement, Donegan did not even raise that issue in any of the subsequent phone conversations or in his first face-to-face meeting with Lee on January 7. Donegan's assertions that he feared raising any disputed issues via telephone is further undermined by his testimony that he believed the royalty scheme in Silicon's draft was a mere "drafting error." In contrast, Donegan had not been afraid to confront Lee, by telephone, about the "fair and reasonable royalties" language that appeared in Lee's email purporting to summarize the agreement reached in the December 17 dinner meeting, nor had Donegan been afraid to raise the issue of HDMI royalties over the telephone.

Taken individually, a number of these inconsistencies may be minor. On balance, and in conjunction with Donegan's unmistakable attempts to avoid Genesis's obligations under the MOU, these factors counsel against crediting Donegan's testimony that he believed that the royalty provision in Silicon's draft definitive agreement was inconsistent with the MOU.

Taken as a whole, the evidence leads to the reasonable and compelling inference that, during the December 18 drafting session, Donegan understood Silicon's intention that the royalty base include all Genesis HDMI and DVI products, irrespective of whether those products infringe any Silicon patent claims. And, taken as a whole, the record leads the Court not to give credence to Donegan's subsequent protestations to the contrary.

### H. The January Negotiations

On the afternoon of January 7, 2003, Silicon's negotiating team[25] arrived at

That, however, does not detract from the subterfuge inherent in deriding Silicon's lack of a "spirit of cooperation" while simultaneously seeking a termination provision with knowledge that an imminent merger will invoke that provision and terminate the business re-

lationship that Genesis and Silicon had only just formed.

**25.** Lee, Atler, McMahon, Shariati, and Howard Freedland, Silicon's general counsel. (Tr. 130).

Day's offices to meet with the Genesis team.[26] Before the start of the meeting, the Silicon team was provided with a separate conference room and, as they waited there, Donegan asked to speak with Lee. In that conversation, Donegan explained that the Genesis board found unreasonable the royalty reduction formula in Silicon's draft agreement and the provisions preventing Genesis from building HDMI transmitters for two-years. (Tr. 131). Lee asked Donegan to propose an alternate formula or schedule and Donegan responded that they could discuss that issue in the following meeting. (Tr. 131). As in each of the previous conversations, Donegan did not raise any issues respecting the royalty base in Silicon's draft agreement. (Tr. 131–32).

At the ensuing meeting between the two negotiating teams, Day began by stating that Genesis had six issues with the Silicon draft definitive agreement and one of Day's associates went to the white board and began to write down the points that Day was addressing. (Tr. 133, 467). Lee interjected that he had not been made aware that there were that many issues and he wanted to focus on the issues that he and Donegan had already discussed. (Tr. 133, 468). Donegan then went to the white board and began speaking about the declining royalty rate and the need to have the rate decline as selling prices declined. (Tr. 228, 469). As Lee began to respond to some of the matters Donegan was raising, Donegan returned to the conference table and, as he sat down, said something to the effect that the MOU royalties only applied to infringing products. (Tr. 134, 228, 470). McMahon immediately interrupted to ask whether Donegan meant to say that royalties applied only to infringing

products and Day [sic] responded affirmatively. (Tr. 471). McMahon's response was, "then we have nothing to talk about" and the Silicon team began to pack up their belongings and leave the meeting. (Tr. 135, 229, 471). As the meeting broke up, Atler asked Donegan what he was thinking at the time he calculated the sales figures for the $C.CC million payment, but Day interrupted and did not allow Donegan to respond. (Tr. 472). After the meeting, Donegan and Lee met privately and agreed to try to reconvene the following day. (Tr. 137, 230, 437).

On January 8, Genesis had yet another board meeting to discuss the MOU. (Pl's Supp. Br. Exh. 20 (Minutes of January 8, 2003 Genesis Board Meeting)). Later that day, the Silicon and Genesis negotiating teams again met at Day's offices. Donegan and Lee met privately before the meeting began and agreed to try to reach a resolution by sticking closely to the MOU terms. (Tr. 136, 230, 474; Donegan Decl. ¶ 25). Lee then left to attend to other business and the remainder of the Silicon team met with Genesis's counsel. (Tr. 475; Donegan Decl. ¶ 25). That meeting broke up very shortly due to the same disagreement over the royalty base. (Tr. 476; Donegan Decl. ¶ 26). When the meeting broke up, Atler sought Donegan out and met with him privately outdoors on a bench in front of Day's offices. (Tr. 477–78; Donegan Decl. ¶ 27). In that meeting, Donegan agreed to pay the $X.XX royalty on all current and future Genesis DVI integrated receivers, but stated that he needed the royalty rate on HDMI products to decline faster and that Genesis had some interest in producing transmitters in the near future. (Tr. 479–84). On the basis of Donegan's concession

26. Donegan, Hahn, Cordell, Day, Eric Erdman, Genesis's chief financial officer, Rob Bicevskis, Genesis's vice president of intellectual property, Anders Frisk, Genesis's chief operating officer and a number of attorneys from Day's law firm. (Tr. 132, 467; Donegan Decl. ¶ 23).

respecting the DVI receivers, Atler agreed to reduce the HDMI royalty at a faster rate. (Tr. 482–83). With respect to the transmitter issue, when Atler asked Donegan for more information, Donegan replied that he did not know the details and had Frisk join them in a small conference room back in Day's offices. (Tr. 484–85).

When Frisk arrived, Atler summarized the agreement he had reached with Donegan—a $X.XX royalty on all DVI integrated receivers. (Tr. 485–86). Frisk responded that Genesis could not afford that price due to the Taiwanese competition, and that the royalty should apply only to infringing parts. (Tr. 486–87). When Atler responded that it would be too difficult to determine which parts infringe, Frisk suggested rewriting the Adopters Agreement. (Tr. 487–89). Atler explained that Frisk's suggestion was implausible because over 100 companies had already signed the agreement. (Tr. 488). The three then agreed to have another meeting in a smaller group to try to determine a way to distinguish between infringing and non-infringing parts, but Atler remained adamant that the royalty base include all HDMI and DVI transmitters and receivers. Atler then joined McMahon and Shariati in a small conference room and awaited the Genesis representatives. (Tr. 491). When no one came, Atler sought out Donegan who said that Day was now in charge of the negotiation and that Donegan would not attend the meeting. (Tr. 491). Ultimately, this final negotiating session again came to abrupt end over the royalty base issue. (Tr. 492). Donegan and Lee also failed to reach any accord in a telephone conversation later that evening.

The next day, January 9, 2003, Genesis had a board meeting where the board passed a resolution to approve the MOU and a separate resolution authorizing the company to file a motion to enforce the MOU. Four days later, both Silicon and Genesis filed their respective motions to enforce the MOU.

## I. The Genesis–Pixelworks Merger

In January, February and March, 2003, Genesis and Pixelworks engaged in further merger negotiations and associated due diligence. (Dresdner Materials p. 6; Pl.'s Supp. Exh. 2 pp. 36–37). During those negotiations, Pixelworks agreed to assume the risk of the dispute over the MOU and the outcome of the pending Silicon litigation while Genesis agreed to assume the risk of certain contracts between Pixelworks and Infineon Technologies AG and Analog Devices, Inc. (Lushtak Depo. 86–87; Pl.'s Supp. Exh. 30 p. 9 (Agreement and Plan of Merger)). On March 16, 2003 the Genesis board approved the merger and on March 17, 2003 Genesis and Pixelworks executed the merger agreement.

As pertains to the issues to be decided here, the most significant aspect of the Genesis–Pixelworks merger and the discovery respecting it is something that was not mentioned in the merger discussions. Specifically, unlike what Donegan told the Court, he did not tell Pixelworks that, if the royalty provision in the MOU was given the interpretation urged by Silicon, the result would be "devastating" to Genesis. (Tr. 240–42).

If, as Donegan testified at the evidentiary hearing, the MOU's royalty provisions would indeed be devastating to Genesis, that certainly was a fact material to the merger. Thus, Donegan either failed to disclose a material fact to Pixelworks, thereby jeopardizing a merger that is of great importance to Genesis and exposing himself and Genesis to an action for fraud, or what Donegan told the Court was untrue.

Considering the numerous ways in which Donegan's testimony has been found

to lack credence, considering the serious adverse consequences of such a non-disclosure, and considering the absence of any evidence to support Donegan's conclusory assertion of "devastation" to Genesis (notwithstanding that there was ample time to have demonstrated that fact if it were true), the Court rejects Donegan's testimony and finds that Silicon's interpretation of the MOU's royalty provisions, which the Court herein adopts, will not have a "devastating" effect on Genesis.

## CONCLUSIONS

The most straightforward reading of the MOU's express terms is that royalties are due on all Genesis DVI and HDMI products, without regard to whether those products infringe any Silicon patent claims. And, only this interpretation will reasonably effectuate the MOU's goal of settling, for all time, the patent infringement issues in the pending litigation.

Moreover, the extrinsic evidence strongly supports Silicon's interpretation and shows that the parties mutually agreed to that interpretation when they drafted the MOU. First, only Silicon's interpretation will fully effectuate the expressly stated goal of protecting Silicon in the event that Genesis should decide to compete directly with Silicon in the market for DVI and HDMI transmitters and discrete receivers. Donegan understood that goal and agreed to a royalty scheme that would achieve that result. Moreover, in exchange for this concession, Lee agreed to $C.CC million less than the $A.AA million plus royalties that he and Donegan agreed to at dinner.

Second, Donegan's calculations for the "Cash Payment" provision evidence his intent that the MOU royalties apply to all products, irrespective of infringement and Donegan communicated this intent to Silicon during the drafting session. This, at the very least, gave Donegan a "reason to

know the meaning" that Silicon attached to the MOU License Agreements. Rest. (Second) Contracts § 20.

Finally, Donegan's behavior, following the receipt of Silicon's draft definitive agreement and before the parties filed their respective motions interpreting the MOU, evidences that, although the Genesis board may have disliked the MOU's royalty rates and broad-ranging royalty base, especially given the possible effect on the planned Pixelworks merger, those provisions were precisely what Donegan had agreed to. The Genesis reaction to both the MOU and Silicon's draft definitive agreement consisted of repeated attempts to terminate the MOU, rather than any effort to address what Genesis allegedly believed were faults in the royalty base described in Silicon's draft definitive agreement. In light of this conduct, there is no credibility in Genesis's assertions that Silicon's interpretation of the MOU is inconsistent with the original intent of the parties.

For the foregoing reasons, the Court finds that the parties agreed to settle this action when they executed the MOU on December 18, 2002; that they had a meeting of the minds on the terms of the MOU according to the interpretation adopted herein, *i.e.*, that the royalties enumerated in MOU Section 1 apply to all the enumerated DVI and HDMI products, irrespective of whether those products infringe the claims of any particular Silicon patent; and that the MOU, as herein construed, reflects the settlement terms to which the parties agreed.

The Court further finds that, after having reached agreement on the MOU, the agreed terms of which were as explained herein, Donegan encountered serious objection from the staff of Genesis and from the Board of Directors. That opposition led to efforts to undo that to which Done-

gan had agreed, and a majority of the Genesis Board had approved, on December 18.

For the reasons set forth above, there was mutual assent to the terms of the MOU, as herein interpreted based on the text of the MOU and the extrinsic evidence of the parties intent. There being no Definitive Agreement, the MOU stands as the binding agreement of settlement.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.